NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0632n.06
Filed: August 24, 2006

Nos. 05-3423/05-3925

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| OSCAR KATABARWA | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON PETITION FOR REVIEW OF AN |
| v. | ) | ORDER OF THE BOARD OF |
| | ) | IMMIGRATION APPEALS |
| ALBERTO R. GONZALES, Attorney General, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

_____

BEFORE: MOORE, CLAY, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Petitioner Oscar Katabarwa ("Petitioner" or "Katabarwa") petitions for review from a decision of the Board of Immigration Appeals ("BIA") summarily affirming the Immigration Judge's ("IJ") decision to deny asylum and withhold removal under the Immigration and Nationality Act ("INA") and relief under the Convention Against Torture ("CAT").[1] Katabarwa first contends that the BIA erroneously affirmed the IJ's adverse credibility determination. Katabarwa also asserts that the BIA inappropriately denied his motion to file a late brief. Finally, Katabarwa avers that the BIA erred by denying his motion to reopen and reconsider. We deny the petition for review.

I.

---

[1]United Nations Convention Against Torture and Other Cruel, Inhumane or Degrading Treatment or Punishment, 1465 U.N.T.S. 85; 8 C.F.R. § 208.18.

Born on March 31, 1970, Oscar Katabarwa is a native of Burundi and a citizen of Rwanda. Katabarwa entered the United States on December 5, 2000, as a non-immigrant visitor for business with the authorization to remain in the United States until August 4, 2001. On January 8, 2001, Katabarwa applied for asylum, in which he asserted persecution arising from his mixed ethnicity and withholding of removal under the INA and also withholding of removal under the CAT. In his application, Katabarwa stated, in pertinent part, that "[he has] been persecuted because of [his] particular ethnic group." A hearing on Katabarwa's removal proceedings was held on February 4, 2004, during which Katabarwa testified in support of his asylum application.

Katabarwa's application and testimony reflect that he fled Burundi because of the consequences arising from his mixed ethnicity. At the outset of his testimony, Katabarwa relayed that he is the son of a Hutu father and a Tutsi mother. Although, as a result, Katabarwa considers both the Hutus and Tutsis his family, he indicated that he is considered by others to be a Hutu, which Katabarwa considered problematic given the historically poor relationship between Hutus and Tutsis.[2] Such a problem manifested itself early on when, according to Katabarwa, a sect of Tutsis known as the Sansechecs entered Katabarwa's home and murdered both his father and brother because of their Hutu ethnicity. Although Katabarwa escaped without injury, he subsequently learned that his home was destroyed and that the Sansechecs were looking for him. As a result, Katabarwa fled to Rwanda sometime after 1993.

---

[2]As the 2002 State Department Report on Burundi reflects, "more than 200,000 persons, mostly civilians, have been killed in ethnic violence since October 1993."

Following his move, Katabarwa began making a new life in Rwanda. In 1997, he married his wife, Nelly, who is a Tutsi and a citizen of Rwanda. Katabarwa also acquired various salaried jobs beginning in 1996, which he retained until 2000, when he began receiving on-the-job training to become an air traffic controller at the Gisenyi airport.[3] For reasons that Katabarwa could not seemingly clarify, he applied for, and ultimately received, a Rwandan passport in May of 2000. Although Katabarwa initially intimated that he applied for the passport for identification purposes and to "go about,"[4] he subsequently testified that he acquired the passport in order to attend an aviation conference in Atlanta.[5] Confusingly, however, Katabarwa did not begin his position as a volunteer trainee at the Gisenyi airport until August of 2000.[6] In any event, after acquiring his passport, Katabarwa became a Rwandan citizen but, according to Katabarwa, he lacked full citizenship rights.

---

[3]Katabarwa's asylum application reflects that, during the period 1996-2000, he worked as a driver, store keeper, and transport officer.

[4]Such testimony is confusing given Katabarwa's corresponding testimony that he possessed a driver's license. Katabarwa, however, indicated that his license could be used for driving only. In response, the IJ observed that "[i]t does seem rather odd to the Court that a passport would be used for internal identification, since a passport, by definition, is primarily an external document, but that's what he says."

[5]The Embassy also issued to Katabarwa a visa in September 2000.

[6]Katabarwa's testimony about his position as a volunteer trainee at the Gisenyi airport generated significant controversy during his removal hearing. According to Katabarwa, he began on-the-job unpaid training at the Gisenyi airport to become an air traffic controller, despite his corresponding admission that he could never earn a paid position because he was not originally from Rwanda. Based on Katabarwa's testimony about his airport position, the IJ commented that "[i]t seems odd that he wouldn't prefer even intermittent employment to employment that paid nothing at all, but that's what he says."

Then, in October 2000, Katabarwa was at home with his wife and child when soldiers arrived at his home and demanded that he come with them to help fight the war in the neighboring Democratic Republic of the Congo ("DRC"). Stating that they knew of his ethnicity, the soldiers then put a gun to Katabarwa's head and told him that he had one week to think about whether he would join them. Given that the soldiers were not prone to public killings, Katabarwa testified that such a tactic was merely a ruse to get him out of the house and kill him. He further stated that he knew there were sufficient soldiers to fight in the DRC, and, thus, their behavior was merely a trick to "kill people secretly." Had the soldiers been sincere in their need for his help, Katabarwa indicated that he would have helped, much like he would volunteer to participate in America's conflict with Iraq.[7]

Katabarwa subsequently left his home to avoid another conflict with the soldiers. For some time, Katabarwa lived from place to place while he raised enough money to pay for his airfare to the United States. *Id.* Although the Atlanta aviation conference fell through before he departed Rwanda, Katabarwa nevertheless elected to pursue his trip to the United States in an effort to ask for help.[8] At this point, Katabarwa stated that he was not hiding from the government, but rather

---

[7]As the government notes, Katabarwa's testimony on this point conflicts dramatically with his asylum application. In his application, Katabarwa stated that "I always disagree with government's soldiers who want me to go fight in neighbouring Congo. I refuse to kill and to fight for something I don't see why, a meaningless battle." With regard to his October 2000 encounter with the soldiers, Katabarwa wrote on his application that "I told them that I'm really unable to help them because I'm Christian and I believe deeply in God. I don't understand why and how I can go kill my other brothers in God; this is unacceptable for me."

[8]Following his arrival in the United States, Katabarwa found his way to the residence of Oscar Niragira's home in Louisville, Kentucky. Niragira, who testified on Katabarwa's behalf at

from "a group of people who just come to, to your house and, and just kill you[.]" Evidently, this is a select group given that, according to Katabarwa, "in Rwanda, the, the problems of the Hutus and, between the Hutus and Tutsis are not there anymore. It seems like they are now at peace."[9]

As a result of the foregoing, Katabarwa stated that he cannot return to Burundi because that country remains dangerous to Hutus. Conversely, Katabarwa indicated that Rwanda is likewise not a viable option for him, given the presence of an unnamed group who "would come and, and snatch [him] and kill [him]."

At the conclusion of Katabarwa's removal hearing, the IJ issued an oral decision denying asylum to Katabarwa. In doing so, the IJ found that Katabarwa was not credible because of four specific problems with his testimony. First, the IJ noted the problematic nature of Katabarwa's testimony about his citizenship in Rwanda. In particular, the IJ observed that, although Katabarwa complained about lacking employment opportunities in Rwanda, he nonetheless possessed a passport and retained periodic employment. Thus, as the IJ concluded, "[i]t's not clear what he was really denied."

Second, the IJ observed that Katabarwa's story about the recruitment efforts of the Rwandan army was contradicted by the State Department Country Report on Rwanda. As the IJ noted, the

_____

his removal hearing, is a Hutu from Burundi and has known Katabarwa since 1980. At the time Niragira left Burundi in 1993, he stated that, although there were "no issues of ethnicity," he had experienced similar problems with the Sansechecs.

[9]Katabarwa's wife also left Rwanda after his confrontation with the soldiers, electing instead to move to Burundi where, because of her Tutsi background, she would not be harmed. Indeed, at that time, a Tutsi government was in power. For some reason, Katabarwa's wife then fled Burundi to move to Tanzania.

war referenced by Katabarwa is now over and, more importantly, the Country Report recognizes that, in Rwanda, the Hutus and Tutsis are not considered distinct groups because the two have inter-married for generations. As a result, the IJ concluded that Katabarwa's story about the soldiers' recruitment efforts was not credible. Third, the IJ disbelieved Katabarwa's story about his wife's flight from Rwanda to Burundi.

Finally, the IJ struggled with Katabarwa's story about working as an unpaid on-the-job air traffic control trainee in the Gisenyi airport. Indeed, the IJ commented that "[i]t appears to the Court, most likely, that respondent is in the United States for economic advantage rather than because he feared any persecution in Rwanda."[10]

Katabarwa appealed the IJ's decision to the BIA on February 17, 2004. In his notice of appeal, Katabarwa checked the box indicating his intent to file a written brief in support of his appeal. The notice, however, warned Katabarwa that if he marked his intent to file a brief, but failed to do so, "[t]he Board may summarily dismiss [the] appeal if [he did] not file a brief or statement within the time set in the briefing schedule." Notwithstanding the warning, Katabarwa failed to file a timely brief and, instead, filed a "Motion to File Late Brief," with his brief attached to the motion eleven days after the deadline.[11] The BIA responded by denying Katabarwa's motion, affirming the

---

[10]In his closing comments, the IJ also observed that, notwithstanding Katabarwa's testimony that a particular governmental group was pursuing him, the government "certainly made no effort to stop him at the airport because he got his exit stamped and departed the country."

[11]The BIA's briefing schedule called for the filing of a timely brief on or before July 15, 2004. Katabarwa did not file his brief until July 26, 2004.

IJ's decision, and noting that "the record supports a finding that the respondent was not credible in these proceedings."

Katabarwa then filed a Motion to Reopen and Reconsider the BIA's first decision based on the discovery of new evidence, and a Motion for Stay of Removal on April 19, 2005. Katabarwa specifically sought to introduce affidavits from two individuals, Kayitesi Chantal and Jean-Pierre Karekezi. In the first affidavit, Chantal testified that she was Katabarwa's neighbor from 1997 until December of 2000 and, additionally, that "those RPF soldiers who were looking for [Katabarwa] are still looking for him up to now." Katabarwa declined to previously submit this affidavit because, according to him, Chantal "had never been a close friend and he did not think she would be interested in helping him[.]" As to the second affidavit, Karekezi, who last saw Katabarwa in November 1990, merely recited facts told to him by Katabarwa. Katabarwa declined to previously submit this affidavit because of difficulty learning the location of Karekezi's residence.

The BIA denied both motions on July 11, 2005,[12] and this timely appeal followed.[13]

II.

Katabarwa first asserts that the BIA erroneously affirmed the IJ's adverse credibility determination. He contends that his testimony was "credible, consistent and logical" given that the

---

[12]Following the denial of his motion for a stay of removal before the BIA, Katabarwa filed a similar motion before this court. Noting that the government did not oppose a stay, a motions panel of this court granted Katabarwa's motion for a stay of removal on April 28, 2005.

[13]Katabarwa initially filed a petition in this court for review of the BIA's order dismissing his appeal and affirming the IJ's decision (docketed as 05-3925). Katabarwa *also* filed a petition for review of the BIA's order declining to reopen and reconsider his case (docketed as 05-3423). The cases were subsequently consolidated.

totality of the exhibits submitted in conjunction with the hearing corroborated his testimony. Although the IJ cited his testimony about his citizenship in Rwanda as problematic, he argues that reliance on such testimony unfairly penalizes him for being "unsure about his exact status in Rwanda." As for the IJ's concern about his testimony regarding the Rwandan army, Katabarwa argues that he adequately explained that the soldiers did not take him away "because there [were] a lot of people around[.]"

In further addressing the IJ's concern about Katabarwa's wife's flight from Rwanda to Burundi, Katabarwa explains that his wife "fled to Burundi to see if she could find any of [his] relatives who had survived." Finally, with regard to his work as an on-the-job trainee at the airport, Katabarwa asserts that he took the job in the hope of later returning "to Burundi to work as an air traffic controller when the conflict in Burundi died down and it was safe to return." Thus, overall, Katabarwa contends that "he answered the questions asked of him to the best of his ability," and, as a result, the IJ's adverse credibility determination was unfounded.

When the BIA summarily affirms a decision without opinion or adopts the IJ's reasoning, we review the IJ's decision directly. *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005). The factual findings of the IJ, including credibility determinations, are reviewed under the substantial evidence standard. *Sylla v. INS,* 388 F.3d 924, 925 (6th Cir. 2004). The substantial evidence standard requires us to uphold the IJ's findings as long as they are "supported by reasonable, substantial, probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). Under this highly deferential standard, "the administrative findings of fact

are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Reversal of a factual determination is warranted only when the reviewing court finds that the evidence not only supports a contrary conclusion, but compels it. *Dorosh v. Ashcroft*, 398 F.3d 379, 381 (6th Cir. 2004).

Credibility determinations are considered findings of fact and are likewise reviewed pursuant to the substantial evidence standard. *Sylla*, 388 F.3d at 925. Although the IJ's determination will be upheld when there are major inconsistencies going to the heart of the applicant's claim, the IJ's findings must nevertheless be supported by specific reasons. *Yu v. Ashcroft*, 364 F.3d 700, 704 (6th Cir. 2004). Discrepancies have no bearing on an applicant's credibility unless they serve to enhance the applicant's claim of persecution. *Sylla,* 388 F.3d at 926. Nonetheless, the cumulative effect of minor inconsistencies can support adverse credibility findings, *Yu,* 364 F.3d at 704, and a single inconsistency may be sufficient to sustain an adverse credibility finding if the inconsistency is related to the alien's basis for his fear and goes to the heart of his asylum claim, *Chebchoub v. INS*, 257 F.3d 1038, 1043 (9th Cir. 2001).

Asylum may be granted to an alien who qualifies as a "refugee," which is defined as one "who is unable or unwilling to return to . . . [his or her home country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1158(b)(1), 1101(a)(42)(A). An applicant for asylum bears the burden of demonstrating that "persecution is a reasonable possibility should he be returned to his country of origin." *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994) (internal

quotation marks and citation omitted). An applicant is not required to demonstrate that he will probably be persecuted if returned because "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987). The applicant's testimony, if deemed credible, may be sufficient to sustain the burden of proof without corroboration. 8 C.F.R. § 1208.13(a).

Even if not entitled to asylum, an alien may secure withholding of removal if he can show that his "life or freedom would be threatened in that country [to which he would be sent] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(b). The petitioner must establish a "clear probability of persecution." *INS v. Stevic*, 467 U.S. 407, 413 (1984). To establish a clear probability, the applicant must demonstrate that "it is more likely than not" that he or she will be persecuted upon return. 8 C.F.R. § 1208.16(b)(2).

To be eligible for protection under the CAT, the applicant must establish "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2); *see Ali v. Reno*, 237 F.3d 591, 597 (6th Cir. 2001) (defining and discussing "torture"). We will uphold the BIA's decision concerning withholding and the CAT unless it is manifestly contrary to law. *Castellano-Chacon v. INS*, 341 F.3d 533, 545 (6th Cir. 2003).

At the heart of this case is whether substantial evidence exists to support the IJ's adverse credibility determination and, correspondingly, the BIA's decision denying Katabarwa's claims. Indeed, the IJ's determination that Katabarwa lacked credibility is dispositive of his asylum claim

because, without credible evidence, he cannot demonstrate either past persecution or a well-founded fear of future persecution. *Accord Adhiyappa v. INS*, 58 F.3d 261, 267-68 (6th Cir. 1995). Moreover, we have recognized that inconsistent testimony and contradictions between a petitioner's testimony and his asylum application may provide sufficient support for an adverse credibility finding. *He v. INS*, 105 F. App'x 54, 57 (6th Cir. 2004) ("Implausible or inconsistent testimony and discrepancies among the alien's asylum application, testimony, and other evidence can support an adverse credibility finding.").

In this case, Katabarwa presented inconsistent statements about matters central to his claim. The inconsistencies highlighted by the IJ include: (1) the status of his citizenship in Rwanda; (2) his story about the recruitment efforts of the Rwandan army; (3) Katabarwa's wife's flight from Rwanda to Burundi; and (4) his employment as an unpaid on-the-job air traffic control trainee in the Gisenyi airport. Although, arguably, inconsistent statements about his wife's flight to Burundi do not go to the heart of Katabarwa's claim, *d Leon-Barrios v. INS*, 116 F.3d 391, 393 (9th Cir. 1997) (noting "minor inconsistencies and minor omissions relating to unimportant facts will not support an adverse credibility finding"), the balance of the IJ's observations relate to the basis for his asylum request.

At the outset, the status of Katabarwa's citizenship in Rwanda is relevant to his asylum application. Indeed, if Katabarwa is a citizen of Rwanda, then Rwanda becomes an appropriate country for removal. *See* 8 U.S.C. § 1231(b)(1)(C)(I). Perhaps more importantly, however, is Katabarwa's story regarding the Rwandan army's recruitment efforts. Even if it is true that

Katabarwa was threatened in October 2000 by soldiers demanding that he join them in the DRC conflict,[14] the 2002 Department of State Country Report reflects that "by October 5, [2001,] all RDF forces had left the DRC."[15]   Additionally, the IJ rightly found Katabarwa's testimony about his employment as an unpaid on-the-job air traffic control trainee problematic.  Although Katabarwa complained that he would be unable to obtain a full-time position as an air traffic controller, he declined to explain why his previously-held salaried positions as a transport officer, store keeper, and driver were no longer viable employment options.  Accordingly, the IJ reasonably determined that Katabarwa was not a credible witness.

Even if the IJ had found Katabarwa credible, Katabarwa nonetheless failed to demonstrate a well-founded fear of persecution in Rwanda because, in his asylum application, Katabarwa focused on the alleged persecution he experienced because of his mixed Hutu-Tutsi ethnicity.  Yet, during his testimony, Katabarwa admitted that "the problems of Hutus and, between Hutus and Tutsis are not there anymore."  Such testimony accords with the Country Report for Rwanda, which notes that Hutus and Tutsis are no longer considered "clearly distinct groups" and, to further that image, the

---

[14]Moreover, although the 2002 Department of State Country Report notes that "[t]he RDF has practiced forced conscription, particularly after the country entered the conflict in the DRC[,]" it does not say that such forced conscription was directed at Hutus.

[15]Katabarwa seemed to change his story when pressed by the government about how, if the Rwandan government was ostensibly looking for him to serve in the military, he was nonetheless able to exit the country with such ease.  In response, Katabarwa stated that he was not hiding from the government but, rather, from an unnamed and unspecified group.  We have, however, previously observed that an applicant must identify the basis for the applicant's fears. *See Akhtar v. Gonzales*, 406 F.3d 399, 404 (6th Cir. 2005) (citing *Capric v. Ashcroft*, 355 F.3d 1075, 1085 (7th Cir. 2004)).

Rwandan government has "eliminated references to ethnic origin from the national identity card." As a result, substantial evidence exists to support the IJ's denial of asylum to Katabarwa. *See Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998) (noting deferential standard of review precludes reversal of "the Board's determination simply because [this court] would have decided the matter differently").

Because Katabarwa failed to establish eligibility for asylum, he was necessarily unable to meet the more rigorous standard for withholding of removal. *Id.* at 391. He also failed to demonstrate that he had been subject to torture, or would be subject to future torture, in order to be entitled to relief under the CAT.[16]

III.

Katabarwa next contends that the BIA erred in denying his motion to file an untimely brief, and further erred in denying his motion to reopen and reconsider. As to his first contention, Katabarwa asserts that the BIA improvidently denied his motion to file an untimely brief because the authoring attorney fell ill shortly before the filing deadline, thus providing a reason that "was more than sufficient for the Board to exercise its discretion in favor of the Petitioner." As to his

---

[16]Although a determination that Katabarwa is not eligible for asylum and withholding of removal does not bar his claim under the CAT, *see Yang v. United States DOJ*, 426 F.3d 520, 523 (2d Cir. 2005); *Settenda v. Ashcroft*, 377 F.3d 89, 94 (1st Cir. 2004), only a limited portion of Katabarwa's brief was dedicated to discussing his entitlement to relief pursuant to the CAT. That portion, however, cited only generalized strife in Rwanda as a basis for granting to Katabarwa relief pursuant to the CAT. Such generalized arguments are insufficient to sustain a claim for relief pursuant to the CAT. *See Velasquez-Velasquez v. INS*, 53 F. App'x 359, 366 (6th Cir. 2002) (denying petitioner's request for CAT relief and noting that petitioner's "claim under the Convention rests on the same grounds as his application for asylum and withholding of deportation").

second procedural argument, Katabarwa contends that the BIA should have reopened his case based on new evidence; specifically, (1) a letter from a former neighbor of Katabarwa's from 1997-2000 who indicated that Rwandan soldiers are still looking for him, and (2) two additional affidavits from Katabarwa's acquaintances who "corroborate his testimony regarding his persecution in Burundi and Rwanda and his credible fear of persecution should he return to either of these countries."

## A.

We review the BIA's refusal to accept Katabarwa's untimely brief for an abuse of discretion. *Huicochea-Gomez v. INS*, 237 F.3d 696, 701 (6th Cir. 2001). In this case, the BIA did not abuse its discretion in declining to accept Katabarwa's untimely brief. The notice of appeal warned Katabarwa that, by indicating his intent to file a brief, his subsequent failure to do so may result in the summary dismissal of his appeal. Although Katabarwa contends that his counsel's illness provided a satisfactory reason for his brief's tardiness, he suggests no corresponding reason why his counsel did not, or could not, file a request seeking an extension of the briefing schedule before filing the brief itself. In the absence of such a request, the BIA acted within its discretion in denying Katabarwa's motion.

## B.

We also review the BIA's denial of a petitioner's motion to reopen for an abuse of discretion. *Sswajje v. Ashcroft*, 350 F.3d 528, 532 (6th Cir. 2003). When "determining whether the [BIA] abused its discretion, this Court must decide whether the denial of [the] motion to reopen . . . was made without a rational explanation, inexplicably departed from established policies, or rested on

an impermissible basis such as invidious discrimination against a particular race or group." *Sako v. Gonzales*, 434 F.3d 857, 863 (6th Cir. 2006) (citation omitted). As a general matter, motions to reopen, particularly in immigration proceedings, are disfavored, and the BIA has "broad discretion" to deny such motions. *INS v. Doherty*, 502 U.S. 314, 323 (1992). When, as here, a petitioner moved the BIA to reopen his case based on new evidence, such motion "shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." *Allabani v. Gonzales*, 402 F.3d 668, 675 (6th Cir. 2005) (citing 8 C.F.R. § 1003.2(c)(1)).

In this case, neither of the two affidavits proffered by Katabarwa satisfy the requirements of 8 C.F.R. § 1003.2(c)(1). Indeed, both documents recite generalized facts which loosely correspond to Katabarwa's hearing testimony. Even if such documents were considered previously unavailable, neither affidavit corroborates his story in any meaningful manner. Accordingly, the BIA did not abuse its discretion in denying Katabarwa's motion to reopen.

For the foregoing reasons, we deny the petition for review.