*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name:  04a0393p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SEKOU SYLLA,

*Petitioner,*

*v.*

No. 03-3077

IMMIGRATION AND NATURALIZATION SERVICE,

*Respondent.*

On Appeal from the Board of Immigration & Naturalization Service.
No. A78 617 158.

Submitted:  September 23, 2004

Decided and Filed:  November 12, 2004

Before:  MERRITT, MOORE, and GILMAN, Circuit Judges.

---

### COUNSEL

---

**ON BRIEF:**  John S. Richbourg, Memphis, Tennessee, for Petitioner.  David J. Kline, Hugh G. Mullane, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, Washington, D.C., for Respondent.

---

### OPINION

---

MERRITT, Circuit Judge.  Sekou Sylla appeals the denial of asylum, arguing that the Immigration Judge ("IJ") and Board of Immigration Appeals ("BIA") erred in assessing his credibility.  The central issue is whether "substantial evidence" supports an adverse credibility determination in relation to Sylla's claims that the Guinean government imprisoned, beat, and tortured him due to his membership in an opposition political party.  For the reasons set forth in this opinion, we grant the petition for review, vacate the judgment of the BIA, and remand for further consideration**.**

### I.  Background

Sekou Sylla, a native of Guinea, entered the United States without authorization in October 2000.  On June 5, 2001, the Immigration and Naturalization Service ("INS") initiated removal proceedings against Sylla.  Sylla conceded removability, but sought relief in the form of asylum, withholding of removal, and relief under the United Nations Convention Against Torture.

On September 28, 2001, Immigration Judge Kevin G. Bradley conducted a final administrative hearing, at which Sylla was represented by counsel.  Sylla testified that he had been detained and beaten because of his membership and involvement in an opposition political party.  In a February 14, 2002, oral

1

decision, Immigration Judge Kevin G. Bradley found that Sylla's testimony was not credible. He entered an order denying the applications for asylum and the withholding of removal, as well as his request for relief under the Convention Against Torture. The Board of Immigration Appeals adopted the immigration judge's adverse credibility finding and dismissed Sylla's administrative appeal on December 17, 2002. Sylla filed a timely petition for judicial review on January 15, 2003.

## II. Discussion

### A. Standard of Review

The general standards for reviewing asylum cases are well-established. *See Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004); *Koliada v. INS*, 259 F.3d 482, 486 (6th Cir. 2001); *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998). This case raises an issue respecting credibility determinations.

Credibility determinations are considered findings of fact, and are reviewed under the substantial evidence standard. *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004). This is a deferential standard: A reviewing court should not reverse "simply because it is convinced that it would have decided the case differently." *Klawitter v. INS*, 970 F.2d 149, 151-52 (6th Cir. 1992) (internal citations omitted). While an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons. *See Daneshvar v. Ashcroft*, 355 F.3d 615, 623 n.7 (6th Cir. 2004); *Gao v. Ashcroft*, 299 F.3d 266, 276 (3d Cir. 2002) ("The reasons must be substantial and bear a legitimate nexus to the finding."). An adverse credibility finding must be based on issues that go to the heart of the applicant's claim. They "cannot be based on an irrelevant inconsistency." *Daneshvar*, 355 F.3d at 619 n.2 (6th Cir. 2004). "If discrepancies 'cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility.'" *Id.* at 623 (quoting *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir. 2000)).

### B. Petitioner's Claims

Sylla testified that he was persecuted in Guinea because of his active involvement with the youth wing of the Rally for the Guinean People political party, a political party opposed to the Government of Lansana Conte and his Party for Unity and Progress. According to his testimony, Sylla became active in the party at the age of twenty-one in the midst of the 1998 presidential election. After the December 14, 1998, election, the candidate, Alpha Conde, was arrested by the Guinean government. This arrest provoked protests in Conakry, the capital. Sylla maintains that he was arrested during the protest of December 20, 1998. He claims that after the police and the soldiers rushed the crowd using tear gas, he was beaten and chained, thrown into the back of a truck, and transported to Camp Alpha Yaya, where he was imprisoned for twenty months without charges being brought against him. Sylla testified that he was beaten with belts and the butts of guns, kicked, and tortured during his imprisonment. He also claims that he was imprisoned in unsanitary conditions with no bathroom and forced to perform labor. Sylla alleges that after he had become quite ill at the camp, a friend of his uncle assisted him in leaving the camp and finding transportation to the United States.

### C. Basis for Adverse Credibility Determination

1. *Inconsistencies Regarding Party Membership Fee and Status as Student.* Both the BIA and the IJ noted inconsistencies and contradictions in Sylla's claims. The IJ and the government's brief point out that in a written statement Sylla claimed he paid 500 Guinean Francs (around $0.40) to become a Party member; in his direct examination, he claimed he paid 1000 Guinean Francs (around $0.80); and in his cross-examination, he testified to paying 5000 Guinean Francs (around $4.00), which is the amount indicated on the membership card. The IJ also highlighted that while his 1998 party membership card identified Sylla as a student and his asylum application indicated he was a student until 1998, his testimony indicated that his schooling ended in 1995.

Such minor and irrelevant inconsistencies cannot constitute the basis for an adverse credibility determination. *Daneshvar* 355 F.3d at 622 n.2; *Gao*, 299 F.3d at 276-77. Sylla had little to gain in claiming to have paid fewer Guinean Francs as membership dues. Nor did his status as a non-student have any relationship to the reliability of his persecution claim. Even the IJ concluded that he did "not doubt" that Sylla may have been involved in the opposition party. These variations, misstatements, or inconsistencies should have played no part in the decision of the IJ or the BIA.

2. *Sylla's Testimony and Corroborating Evidence.* The IJ and the BIA primarily based their adverse credibility determinations on the lack of detail regarding the twenty months Sylla was imprisoned, specifically his inability to name his cell mates. The IJ writes:

> The Court is also concerned with the fact that the respondent has testified that he was held in the Alfa [sic] Yaya Prison for 20 months along with three other individuals in a small prison cell in what he has described as rather squalid conditions. Respondent, however, has indicated that he does not know who these individuals were other than to state that they were members of the RPG. The Court finds it rather implausible that one would spend nearly two years in prison in a cell with other members who hold the same political views as you and who are apparently being detained as a result of those views. And yet, one would never come to know anything at all about them to include even at minimum, their names.

(J.A. at 26.) This finding is not supported in the record. Through a translator, Sylla did testify that he did not know his cell mates when he was arrested, but he also stated that he later got to know his cell mates and learned their names were Onfontule, Sidikata, and Komora.[1]

The IJ was also troubled with the testimony of a witness produced by Sylla, Amade Kaba. Kaba was presented to corroborate Sylla's membership and involvement in the party before his arrest. Kaba had been granted asylum in the United States. Kaba testified that he also had been arrested at the December 1998 protests and held in three different prisons in Guinea for 20 months, including 10 months at Camp Alpha Yaya. Kaba stated that he did not see Sylla during the time when their imprisonment would have

---

[1] Below is Sylla's testimony regarding the identities of his three cell mates. On direct, he testified as follows:
Q.  Were you by yourself in the cell or were other people with you?
A.  I was there with many other people. . . . Three people plus myself.
Q.  Did you know the three people who were in the cell?
A.  No, I didn't know any of them.
(J.A. at 47.) On cross examination, the government continued this line of questioning:
Q.  Do you know the names of persons in the cell that you were, that you shared, you shared with, shared the cell with?
A.  No, I didn't know their name.
Q.  Did you ever talk to them at any time?
A.  Yes, we spoke, mainly to each other, what's your name, this is my name, or family name, things like that but were afraid to say anything else.
Q.  Well if they didn't told you their name, you told me, then why wouldn't you know what their name is, sir?
A.  To start with, at the beginning, I did not know their name, but with time, yes, I knew their name.
Q.  I've asked you if you knew their name and you said no.
A.  Maybe I did not understand what you said, maybe I told you you ask me if I knew their name earlier.
Q.  Well, I'm asking you now, sir, do you know their name?
A.  Yes.
Q.  What is their names?
A.  Onfontule (phonetic sp.) was one of them. One was Sidikata (phonetic sp.) one is Larry Komora (phonetic sp.).

(J.A. at 61-62.) In his written statement, Sylla writes;
I was grabbed and arrested and put in a truck were [sic] other protesters were placed. I saw several members from my area in the truck, including Souleymane Diarra, Ibrahima Sidibi, Chiekh Oumar Camara. Many others I recognized by face but did not personally know them. We were taken to Alpha Yaya camp. I was put in a cell with three other protester [sic]. I did not know these men but they too were RPG members arrested at the demonstration.
(J.A. at 73.)

overlapped. The IJ found it "possible" though "somewhat improbable that one would spend such a long period of time in prison and not learn of another's presence there or see him when according to respondent's testimony, they were often outside of their cells performing work in the prison areas." The IJ also suggested that Sylla "may be mimicking an incident that has happened to another individual and not to himself." The BIA's decision did not explicitly point to this matter in its affirmation of the IJ's ruling.

On the first point, there is no evidence in the record as to the size of Camp Alpha Yaya or the number of prisoners there and no evidence as to whether prisoners interacted among themselves. The IJ points to no basis for his determination that two prisoners could possibly not see each other, but probably would have. As to the second point, the similarity in the incidents could be troubling to the extent Sylla is borrowing his friend's story. But this similar account could also be seen as corroborative of the Government's treatment of young members of opposition political parties. Especially since the BIA did not rely upon this incident, the testimony of Kaba is not a sufficient basis for finding that Sylla lacked credibility.

Both the IJ and BIA indicate that Sylla's testimony was lacking in detail concerning his arrest and imprisonment. The BIA additionally noted that his release from prison and travel to the United States were not adequately explained. The record, however, indicates that Sylla through his Malinke translator gave specific answers to almost every question asked. In describing the street protests on the day of his arrest, Sylla identifies the street names where the protest occurred, that he was marching with the youth while his father was marching with the elders, and that they were protesting the detention of the their party leader Alpha Conde. He described the "police and the soldier[s]" rushing the crowd and using teargas. He describes how they threw him to the ground, beat him, chained him, and threw him in the back of a truck. In his written statement, he mentions that several Party members from his area were also arrested: "Souleymane Diarra, Ibrahima Sidibi, Chiekh Oumar Camara." They were taken to Camp Alpha Yaya, where he was placed in a small unsanitary cell with three other members of his party, whom he did not know at the time. During the next two weeks, they were interrogated and tortured every day. Sylla alleges that he was beaten with the bottom of a gun, kicked, and hung upside-down by his feet and beaten. He testified that they were interrogated regarding Alpha Conde "and the mercenar[ies] and the rebel[s] he tried to bring into the country."[2] Sylla claims that during the 20 months he was imprisoned, he was also forced to perform labor, including "splitting wood" and "wash[ing] clothes." He alleges that he became ill while imprisoned, suffering from stomach aches and fevers. He describes how his uncle's friend Sorebria Turee sought the cooperation of one of the camp's guards, Masumba Macamba, to arrange his release. Macumba woke him in the middle of the night and released him to Turee, who was waiting in a car outside. Sylla did not know whether the guard was authorized to release him or whether Turee bribed Macumba for Sylla's release. Turee kept Sylla at his home at "Mototu" in "Kolope," where he spent two months recovering. Turee informed Sylla that he did not know where his family had gone, but that he later learned that his father had been missing since the protests of December 1998 and the rest of his family was in a refugee camp in Mali. Turee arranged for the necessary papers and money with another individual, Bakare Wadi, for Sylla's trip to America. On an "Air Afrike" plane, Sylla flew from Guinea to Senegal, and from Senegal to New York, arriving on October 14, 2000.

To corroborate his allegations, Sylla produced his political party membership card and his Guinean citizenship documents. He also presented corroborative letters sent by his family from a refugee camp in Mali: one from his mother and one from his uncle. The IJ discounted these letters as they "appear to be written for the sole purpose of restating the facts for the respondent's asylum request."

3. *The State Department Report.* In his decision, the IJ asserted that he had "placed a great deal of emphasis on the department of State Report" in finding Sylla's claims lacked credibility. The IJ concluded:

---

[2]The State Department Country Report for Guinea indicates that Alpha Conde, after his December 15 arrest "was charged with illegal use of military force, undermining the authority of the state and the integrity of the national territory . . . ." (J.A. at 91.) Sylla's description of the interrogation seems consistent with the investigation of Conde.

> The Court does not, in any way, condone the actions of the Guinean authorities and does not minimize the fact that individuals are apparently arrested and detained frequently for political reasons, under the guise of having committed criminal offenses. However, the Court also finds that these individuals are detained for relatively brief periods of time before being released. The Court, therefore has concluded that the respondent's claim of persecution and detention in the Alfayaya [sic] prison is not plausible and the respondent has, therefore failed in his burden of proof.

(J.A. at 29-30.) The State Department Country Report for Guinea does not support the IJ's assessment. The IJ was "not convinced that the actions of the respondent in this case subjected him to anything other than the apparent routine harassment and perhaps brief internment which is common in Guinea." The IJ suggested that as "it does not appear . . . he was a particularly involved member of this organization in that he has indicated that his activities consisted of handing out flyers and posters and participating in demonstrations." Yet, the State Department report suggests that mere participation in demonstrations in Guinea can be a dangerous thing. The report finds that the Government has regularly directed or turned a blind eye toward violence directed at opposition political parties. The 2000 report indicates that during the June 2000 municipal elections, 44 persons including children, women, old men and an imam were arrested. "They were taken to a military camp, where they reportedly were stripped, threatened, beaten, and tortured." According to the report, the Guinean government continues to hold "an unknown number of political prisoners . . . incarcerated for allegedly politically motivated acts, such as protests, meetings, and campaigns." The report also suggests that there have been politically motivated disappearances.

In fact, the report corroborates that the incidents Sylla describes did occur to some members of his party. The report indicates that Alpha Conde was indeed arrested on December 15, 1998, following the presidential elections. The report continues, "Conde's arrest led to the street protests by RPG militants in Conakry, which were repressed by police, resulting in the arrest and detention of many protesters." Further, the report indicates that Guinean security forces regularly arrest and detain individuals arbitrarily. They imprison individuals by holding them incommunicado without charges and violate the Guinean Penal Code by detaining civilians at military camps. Prison conditions are reported to be "inhuman [sic] and life-threatening" due to overcrowding, poor sanitation, and malnutrition. "Security forces often use torture and beatings to extract confessions and employ other forms of brutality." The report also notes that "some prisoners are bound and hung by their feet before being beaten."

### III. Conclusion

The record does not support the reasons offered by the BIA or the IJ in support of an adverse credibility determination. The order of the BIA is therefore vacated, and the case is remanded to the BIA for further proceedings consistent with this opinion.