NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0203n.06
Filed: March 28, 2006

No. 03-4531

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SHPETIM BLETA, LINDITA BLETA, and BRUNILDA BLETA, | ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) ) | ON PETITION FOR REVIEW FROM AN ORDER OF THE BOARD OF IMMIGRATION APPEALS |
| ALBERTO GONZALES, United States Attorney General, | ) ) ) | |
| Respondent. | ) ) | |

Before: DAUGHTREY and McKEAGUE, Circuit Judges, and MCCALLA,[*] District Judge.

**PER CURIAM.** Lead petitioner Shpetim Bleta and the two other petitioners, Shpetim's wife, Lindita, and their daughter Brunilda, are Albanian nationals. They challenge the summary affirmance by the Board of Immigration Appeals (BIA) of the immigration judge's denial of Shpetim Bleta's petition for asylum, withholding of removal, and relief under the U.N. Convention Against Torture. The immigration judge found that Bleta was not credible and that, even if his account of events were to be believed, he had not presented sufficient evidence to support a claim for refugee status. Because this

---

[*]The Hon. Jon Phipps McCalla, United States District Judge for the Western District of Tennessee, sitting by designation.

determination was based on substantial evidence, we find no basis to disturb the ruling of the immigration judge.

## **FACTUAL AND PROCEDURAL BACKGROUND**

Shpetim Bleta entered the United States at New York City as a business visitor on April 13, 2000. His daughter, Brunilda Bleta, was already in New York City, having entered the country as an exchange visitor on September 3, 1999. His wife, Lindita Bleta, entered the United States two months after he did, on June 15, 2000, without valid documents required for entry.

On August 23, 2000, Shpetim Bleta filed an application for asylum and withholding of removal on behalf of himself and his wife and daughter. In October 2000, the former Immigration and Naturalization Service sent each petitioner a notice to appear, charging Bleta and his daughter with violating section 237(a)(1)(B) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(1)(B), for remaining in the country longer than permitted by the terms of their respective visas, and charging Bleta's wife with violating section 237(a)(1)(A) of the Act, 8 U.S.C. § 1227(a)(1)(A), for being in one or more classes of inadmissible immigrants. At a calendar hearing on January 2, 2001, all three petitioners admitted the factual allegations in their respective notices to appear, conceded their removability, and indicated that they wished to seek asylum.

Bleta's asylum application is based upon his purported membership in a political group that he identifies as the pro-monarchy Legality Party. Bleta claimed to have been "politically persecuted by the communist regime because [he is] a descendant of a family very well known for the patriotic and anti communist [sic] traditions on both [his] mother's and [his] father's side." According to Bleta, his father was executed by the Communists in 1961 based on his support of the exiled royal family of Albania. Following the regime change in Albania in 1991, Bleta himself allegedly became active in the reconstituted Legality Party, which, he claimed, advocates for the return of a constitutional monarchy. Bleta said that he was nominated by the party as a candidate in a parliamentary election held in 1997, but that the proposed return to a constitutional monarchy was defeated in a referendum vote, an outcome that was contested by the Legality Party. As a result of his continued involvement in the party, Bleta claimed to have suffered "the most horrible mental and emotional suffering" at the hands of "the communists in power," describing four specific instances.

First, Bleta asserted in his asylum application that he had participated in a protest in Tirane against the results of the 1997 referendum election, during which "the new government used the force against us thus killing also militants of our party." In his testimony, Bleta claimed that he was hit in the face with brass knuckles by a member of the secret police, the SHIK.

Second, Bleta claimed that in February 1999 he was detained by two policemen who searched his car and discovered propaganda materials for the king. Bleta testified that the policemen allegedly threatened his life, punched him, and hit him with a club, but this incident was not included in Bleta's original asylum application.

Third, Bleta claimed that on December 6, 1999 "a bunch of men stopped me and started yelling at me. After that they hit me and threatened that they would kill me if I would not stop supporting the king." In his testimony at the hearing, however, Bleta testified that this incident had taken place on December 2 and that his attackers had been members of the socialist party and the SHIK.

Finally, Bleta claimed that on April 5, 2000, his license plates were stolen while he was at a party meeting. When he reported it to the police, they allegedly admitted responsibility for taking his license plates, telling him that "next time we'll take your head off if you don't stop with your activities with your party in defense of the king." In his hearing testimony, Bleta added that a police officer at the station punched him in the face and kicked him repeatedly. In his asylum application, Bleta indicated that this incident convinced him that his life was in danger and that shortly thereafter, he sold his house and car and left the country.

The immigration judge noted several significant inconsistencies between Bleta's asylum application and his testimony at the hearing.[1]  For example, the judge noted that Bleta omitted crucial details and even entire events from his account of the incidents of state-sponsored violence in his asylum application.  When questioned about the omissions, Bleta testified that he had wanted to keep his application brief.  The immigration judge also noted that in his application, Bleta claimed that his wife and children were beaten and threatened.[2]  However, Bleta did not support this assertion in his testimony at the merits hearing.  Moreover, his wife or daughters, who were both present at the hearing, offered no testimony at all, corroborating or otherwise.  Moreover, concerning his claim to have been a candidate for the Legality Party in the 1997 parliamentary election, Bleta was not able to produce a ballot to corroborate his candidacy.  In his testimony, he said that he was nominated but that the electoral commission, through corruption, had kept his name off the ballot.

Finally, the immigration judge, referring to Bleta's assertion in his asylum application that the incident of April 5, 2000, was the impetus for his decision to flee Albania, noted that Bleta had admitted in his testimony that he had obtained a visa one month prior to the April incident.  The judge also found it incredible that despite Bleta's purported fear for his life

---

[1] Bleta originally indicated a desire to supplement his original asylum application, and was granted leave to do so. However, the resubmitted form was substantially similar to the first, with only minor changes.

[2] Bleta has a second daughter, who was not a beneficiary of his asylum petition. She is living in the United States and has obtained legal status.  In his asylum application, Bleta wrote, "As a result of my political activities...[m]y daughters have been beaten and harassed at school.... My wife has been threatened for her life."

at the hands of the ruling party, he was employed by the municipal government of Tirane as chief of public transport from 1994 until he left the country. Moreover, Bleta had left Albania several times – twice to Macedonia, and once to Turkey – during the period of purported harassment and abuse, and had voluntarily returned without apparent difficulty. The lapse of several years between reported instances of abuse also undermined Bleta's claim. Significantly, Bleta's purportedly antagonistic relationship with the government was belied by the fact that he obtained a visa for official government business, relating to the visitation of a mosque in the Detroit area.

In determining the petitioner's credibility, the immigration judge also relied upon the State Department's *Country Report for Human Rights Practices in Albania*, which concludes that it is highly unlikely that the Socialist Party in power Albania has the inclination or ability to engage in organized repression of political dissidents. Furthermore, Bleta's expert, Dr. Fisher, testified about the existence of blood feuds in present-day Albania but was unable to relate this phenomenon to the Bletas in any way.

Based on Shpetim Bleta's contradictory and evasive answers at the hearing, the judge determined that he was not credible. Specifically, the immigration judge concluded, "Quite frankly, the Court finds that [Bleta] can't keep a story straight, is not telling the truth, and nothing he relied upon can be believed with exception of perhaps his identity and the fact that he worked for the municipality of Tirane in the public transportation arena." In addition, the judge found that even if all of Bleta's assertions were to be believed, they did

not constitute sufficient proof to establish past persecution and, therefore, that he was not entitled to a presumption of future persecution under 8 C.F.R. § 208.13 for asylum applicants or 8 C.F.R. § 208.16 with respect to withholding applicants. Accordingly, the judge denied Bleta's applications for asylum, withholding of removal, and withholding of removal under the Convention Against Torture. The petitioners were ordered removed to Albania. They appealed to the BIA, which affirmed the decision without opinion.

## DISCUSSION

When the BIA affirms a decision of an immigration judge without opinion, we review the immigration judge's decision as the final agency decision. *See Denko v. INS*, 351 F.3d 717, 726 (6th Cir. 2003). The immigration judge's legal conclusion are reviewed de novo and its factual findings for substantial evidence. *See Tapucu v. Gonzales*, 399 F.3d 736 (6th Cir. 2005). In order to reverse a factual determination, we must find that the evidence not only supports a contrary conclusion, but indeed *compels* it. *See Klawilter v. INS*, 970 F.2d 149, 152 (6th Cir. 1992).

On appeal, Bleta contends that the immigration judge erred in failing to permit him to supplement his application with various documents: photographs of himself, purportedly with the King of Albania, police reports relating to two of his alleged incidents of persecution, hospital records documenting his vascular disease (allegedly the result of forced labor), a letter confirming his membership in the Legality Party, and so forth. The immigration judge disallowed the introduction of these documents into the record because

they were filed late.  Moreover, as the judge observed, the documents did not comply with administrative rules because they were supported by affidavits that were not made under oath according to 8 C.F.R. § 103.2 or authenticated according to 8 C.F.R. § 287.6. Moreover, those allegedly translated from Albanian to English lacked the certificates of translation required by 8 C.F.R.  § 3.33.  We conclude from these deficiencies that the immigration judge did not commit reversible error in excluding the documents from the record.

Nor did the immigration judge err in his credibility determinations, which are treated as findings of fact and reviewed under the "substantial basis" standard.  *See Sylla v.  INS*, 388 F.3d 924, 925 (6th Cir.  2004).  An adverse determination of credibility is owed substantial deference but must be supported by specific reasons.  *See id.* at 926. Evidentiary inconsistencies, provided that they go to the heart of the applicant's claim and are not merely irrelevant or trivial, are sufficient to support an adverse credibility determination.  *See id.*; *see also Hassan v.  Gonzales*, 403 F.3d 429, 434 (6th Cir.  2005).

It is clear from the record that the immigration judge's credibility determinations were based on glaring inconsistencies in Bleta's account that went to the heart of his asylum claim.  These inconsistencies, detailed above, include the extent of his involvement in the Legality Party; his failure to mention certain key events in connection with alleged police harassment and incidents of police violence in his asylum application; material differences, including the identity of those responsible for the attacks, between the  version of events

offered in his application and in his testimony; a complete dearth of evidence regarding the harassment of his wife and daughters; the fact that he voluntarily left and returned to Albania at least three times during the period of alleged persecution; his continued and seemingly conflict-free employment by the municipal government; and, finally, the circumstances under which he procured a visa from the government.  Many if not all  of these inconsistencies would be sufficient by themselves to support an adverse credibility determination.  *See*, *e.g.*, *Yu v. Ashcroft*, 364 F.3d 700, 703-04 (6th Cir.  2004) (affirming adverse credibility finding based in part on implausible testimony regarding departure from native country); *Pilica v.  Ashcroft*, 388 F.3d 941, 942 (6th Cir.  2004) (affirming adverse credibility finding based in part on applicant's failure to call available family members as witnesses); *see also Ngarurih v.  Ashcroft*, 371 F.3d 182, 189 (4th Cir.  2004) (prior voluntary return to country demonstrates that applicant is neither unable nor unwilling to return to native country).  Taken together, the contradictions in this record are simply overwhelming, and there exists absolutely no basis for overturning the decision of the immigration judge that they defeated the petitioner's claim that he was entitled to asylum.

## <u>CONCLUSION</u>

In this case, the lead petitioner failed to adduce credible evidence to establish that he is a refugee within the meaning of the Act.   The immigration judge's finding that Bleta lacked credibility is dispositive of his asylum and withholding claims, which were based on the same asserted facts.  Because Bleta was unable to meet the burden of proof required

for asylum, it follows that he is unable to meet the higher burden of proof required for withholding of removal under the Act or for an affirmative ruling under the Convention Against Torture. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 429-21 (1987) (finding that the burden of proof is more stringent for withholding than for asylum); *see also* 8 C.F.R. 208.16 (requiring a "clear probability" of future persecution for withholding of removal). We therefore DENY the petition for review and the request for relief in this case.