NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0838n.06
Filed: November 15, 2006

No. 05-3872

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| EMMANUEL SAAH, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW OF AN |
| | ) | ORDER OF THE BOARD OF |
| ALBERTO R. GONZALES, | ) | IMMIGRATION APPEALS |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

Before: KENNEDY and GIBBONS, Circuit Judges; ALDRICH, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Petitioner, Emmanuel Saah, appeals the decision of the Board of Immigration Appeals ("BIA") affirming without opinion the decision of the Immigration Judge ("IJ") denying Saah's application for asylum and withholding of removal. For the reasons below, we affirm the BIA decision.

### I.

Saah, a native and citizen of Cameroon, arrived at Dulles Airport on April 22, 2001. On that day, an immigration inspector for the then-Immigration and Naturalization Service[1] interviewed Saah

---

[*] The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

[1]The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (codified as amended in scattered sections of 6 U.S.C.), abolished the INS.

1

concerning his background and the reason for his presence in the United States. Saah represented to the inspector that he had traveled to the United States to attend a food and safety conference and had plans to stay in the country for two weeks at the Wardman Park Marriott Hotel. When asked to explain why the Marriott had no reservation for Saah's stay and why a hotel employee had informed the inspector that the conference was over, Saah claimed someone had assured him the reservation was made. Saah further stated that he had never been arrested anywhere in the world and did not fear returning to Cameroon.

On April 19, 2002, Saah attempted to file an application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158(b) and 1231(b)(3)(A), and for withholding of removal under Article 3 of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") with the immigration court in Detroit, Michigan. The INS issued a notice to appear dated August 14, 2002,[2] informing Saah that he was subject to removal for being a potential public charge, procuring admission into the United States by fraud or willful misrepresentation, and lacking valid documentation permitting him to remain in the United States. The notice directed Saah to appear before an immigration judge in Arlington, Virginia.[3]

Saah filed his asylum application with the INS in September 2003.[4] Saah represented in his

---

[2]Saah states that he was placed in immigration proceedings by a notice to appear dated April 6, 2001. Saah does not include a copy of an April 2001 notice in the administrative record, and the only notice to appear available to us is dated August 14, 2002.

[3]The matter was transferred to Detroit, Michigan, following a motion for change of venue.

[4]Saah's initial attempt to file with the immigration court was in error, as respondent points out. Asylum applicants are to file with the center servicing the asylum office with

asylum application that he belongs to the Southern Cameroon National Council ("SCNC"). As Saah described the purpose of the SCNC, the organization seeks separation of Cameroon between the Anglophones residing in the previously British-occupied part of the country and the Francophones in the part of the country previously colonized by the French.[5] Saah claimed that the Cameroonian government, controlled by the Cameroon People's Democratic Movement, has resisted division and that, because he is an active member of the SCNC, his return to Cameroon would result in "torture, molestation, and violation of [his] human rights, rape, and [being] beaten to death." AR 361. In his application, Saah cited as evidence his April 1997 detention and torture at the hands of the Gendarmarie, a Cameroonian police force with partial responsibility for internal security.

On April 7, 2004, the IJ assigned to Saah's application held an individual hearing on Saah's application. At that hearing, Saah expanded on the information contained in his asylum application,

---

jurisdiction over the applicant's place of residence, current lodging, or land border port-of entry through which the alien seeks admission. 8 C.F.R. § 1208(b)(1). Filing with the immigration court is appropriate only after exclusion, deportation, or removal proceedings have begun. 8 C.F.R. § 1208.4(b)(3)(i).

[5]A State Department report included in the record explains:

The division between Cameroonians along linguistic lines is a remnant of colonialism. After World War I, a League of Nations mandate partitioned the German colony of Kamerun . . . between Britain and France. In 1960, French Cameroon achieved independence after an armed struggle and established the republic of Cameroon. A year later, the largely Muslim northern half of British Cameroon voted to join Nigeria while the largely Christian southern half voted to join with the Republic of Cameroon, forming the Federal Republic of Cameroon, with each region initially maintaining substantial autonomy. In 1972, constitutional changes provided for strong central government, thereby ending the status of the Anglophone region (today's Northwest and Southwest provinces) as a federal entity within the Cameroon union.

AR 354-55.

3

describing his functions in the SCNC and offering further information on the mistreatment he claimed to have suffered at the hands of the Cameroonian government. The IJ, by oral decision, denied the entirety of Saah's application on the grounds that Saah filed his asylum application after the one-year deadline and was not credible. Saah appealed the IJ's decision to the BIA. On June 9, 2005, the BIA issued an order affirming the IJ's decision without opinion and deeming the IJ decision the final agency determination. Saah appeals.

## II.

Saah begins with a challenge to the streamlined decisionmaking procedures governing appeals to the BIA. Although Saah's brief is not entirely clear as to the specific features he wishes to challenge, he seems to take issue with the one-judge review procedure provided for under 8 C.F.R. § 1003.1(e)(3) and the affirmance-without-opinion option provided the BIA under 8 C.F.R. § 1003.1(e)(4). Saah claims that both procedures are violative of asylum petitioners' right to due process. We review Saah's due process claim *de novo*. *See, e.g.*, *Denko v. INS*, 351 F.3d 717, 726 (6th Cir. 2003); *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998).

The Sixth Circuit has consistently and definitively rejected Saah's argument, finding that the BIA procedures he challenges produce no constitutional injury. *See, e.g.*, *Lumaj v. Gonzales*, 462 F.3d 574, 576 (6th Cir. 2005) (rejecting petitioner's claim that single-judge review and clearly erroneous review standard violated due process); *Denko*, 351 F.3d at 730 ("[I]t is not a due process violation for the BIA to affirm the IJ's decision without issuing an opinion.") (internal quotation marks omitted). We therefore hold, as have panels before us, that the BIA's use of streamlined decisionmaking procedures does not infringe on a petitioner's right to due process.

## III.

4

Saah also challenges the IJ's decision to deny his application for asylum on timeliness grounds. Under the INA, an alien must file his application for asylum within one year after the date of his arrival in the United States. 8 U.S.C. § 1158(a)(2)(B). An applicant must provide clear and convincing evidence that his filing complied with this requirement. *Id.* The IJ found Saah did not file his asylum application until September 2003, more than a year after his April 2001 arrival in the United States and denied the application on that basis.

The Sixth Circuit has held that the statutory provisions governing appellate review of BIA decisions preclude review of denials of asylum applications for untimeliness where the petitioner "seeks review of discretionary or factual questions," rather than constitutional claims or matters of statutory construction. *Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006) (considering the application of 8 U.S.C. § 1252(a)(2)(D)).[6] Saah does not argue that his claims fall within either of these two exceptions to the general rule that an appellate court may not review a BIA timeliness decision, and we conclude Saah's claims do not qualify for review under the statute. We, therefore, may not and do not consider the propriety of the IJ's timeliness decision.

## IV.

A petitioner who files requests for withholding under the INA and the CAT raises two distinct claims, subject to separate legal standards. An appellate court reviews the BIA's decision on those requests utilizing an identical standard, however. See *Almuhtaseb*, 453 F.3d at 749. Administrative findings of fact "are conclusive unless any reasonable adjudicator would be

---

[6]Prior to the adoption of the REAL ID Act of 2005, Pub. L. 109-13, Div. B, 119 Stat. 231 (May 11, 2005), the Sixth Circuit held that federal law prohibited judicial review of timeliness decisions without regard to the basis of petitioner's claim on appeal. *See Castellano-Chacon v. INS*, 341 F.3d 533, 544 (6th Cir. 2003). In *Almuhtaseb*, the court modified its holding in *Castellano-Chacon* to account for the changes wrought by the Real ID Act. 453 F.3d at 748.

compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). The court must uphold the BIA's decision unless it is "manifestly contrary to the law." *Almuhtaseb*, 453 F.3d at 749.

The INA prohibits removal of an alien to another country if the Attorney General determines that the alien's "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3). A petitioner must show "a clear probability, that is, that it is more likely than not, that [he] would be subject to persecution on the basis of one of these five grounds were [he] removed from this country." *Almuhtaseb*, 453 F.3d at 749 (internal quotation marks omitted); *see also Rreshpja v. Gonzales*, 420 F.3d 551, 557 (6th Cir. 2005). An applicant who demonstrates that he has suffered past persecution in the proposed country of removal enjoys a presumption "that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim." 8 C.F.R. § 208.16(b)(1)(i).

By contrast, a petitioner seeking withholding of removal under the CAT is not required to show that any alleged prospective harm is based on one of the protected groupings under the INA. *Almuhtaseb*, 453 F.3d at 751; *Castellano-Chacon*, 341 F.3d at 551. Instead, a petitioner must demonstrate a "particularized threat of torture." *Id.* It must be "more likely than not that he or she would be tortured if removed to the proposed country of removal." *Rreshpja*, 420 F.3d at 557 (quoting 8 C.F.R. § 208.16(c)(2)).

Saah testified to three instances of persecution and torture in Cameroon.[7] The first incident occurred in April 1997, when he was arrested by two members of the Gendarmerie and taken to the

---

[7] Saah testified that other arrests occurred, but could not recall any of the information relating to those arrests.

local police station. Saah stated that during the week he was held, he was interrogated, forced to strip naked, subjected to increasingly severe beatings, tarred, made to masturbate, and left in a cell with two feet of standing water. In November 1997, Saah was allegedly taken from his home by four members of the Gendarmerie and returned to prison where he was subjected to similar acts of physical abuse. Saah's November detention lasted for three days according to his account. In April 2000, Saah claimed, he was taken from the fish market in Limbe, his home, and detained for four months, during which time he was the victim of abuse nearly identical to that he suffered during his previous detentions. According to Saah, a relative informed him that the Cameroonian government planned to kill him because of his activities with SCNC. This warning, along with a series of threats on his life, prompted him to leave Cameroon.

The IJ deemed Saah's testimony "inherently incredible," finding it "inconsistent on its face . . . inconsistent with his application, and . . . diametrically opposed to his statement at the Dulles Airport . . . ." AR 41. Based upon this adverse credibility finding, the IJ rejected Saah's request for withholding under both the INA and the CAT. The IJ identified a series of problems in Saah's account of his abuse while in Cameroon that led him to discredit Saah's claim, noting, first, that Saah's statement to the immigration inspector upon his arrival in the United States directly contradicted his later claim that he had been arrested repeatedly and feared for his life if returned to Cameroon. When asked about his earlier representations to the immigration inspector, Saah testified to having no recollection of what transpired at that meeting.

The IJ observed a series of discrepancies in Saah's report of abuse at the hands of the Cameroonian government. He could not provide a fixed account of the number of times he was detained while in Cameroon or the dates of his detention. He also failed to provide a full description

7

in his asylum application of the forms of abuse he suffered and was unable to produce any documentation confirming the injuries sustained as a result of his time in detention. Finally, Saah testified that members of the Gendarmerie released him even though, according to his testimony, he informed them that he would continue his activities with the SCNC. This, the IJ concluded, made little sense if Saah's detention was intended to deter further activities on the party's behalf.

In addition, Saah was unable to produce the originals of any of the documents he produced as evidence and offered what the IJ deemed to be an unbelievable explanation for this omission. Saah testified that his car, containing the originals, was stolen the previous evening. Asked about the circumstances surrounding the robbery, Saah recited a lengthy story, which the IJ ultimately deemed "completely made up." AR 44. The IJ refused to admit copies of the materials offered by Saah on the ground that the documents were "inherently unreliable on their face." AR 43.

The IJ also found implausible Saah's claims that the Cameroonian government was out to harm him. He expressed disbelief that a government Saah claimed was set on killing him would allow him to continue working for the Cameroonian Development Corporation, an entity partly owned by the government, following Saah's arrest. He also discounted Saah's claim that the government would kill him upon his arrival in Cameroon, noting that the same government had permitted Saah to obtain a passport and pass through border control in order to travel to the United States.

The IJ further noted that Saah fraudulently obtained his visa to travel to the United States and cited this initial act of dishonesty as evidence of Saah's tendency to "[tell] some lie in order to get what he wants . . . ." AR 56. Obviously convinced Saah had contrived nearly all of his testimony, the IJ refused in the strongest terms to credit Saah's testimony and, on that ground, denied his

8

requests for withholding of removal under the INA and the CAT.

Credibility decisions by an IJ are factual findings for appellate review purposes, and a reviewing court must determine whether substantial evidence supports the IJ's findings of fact. *Bah v. Gonzales*, 462 F.3d 637, 640 (6th Cir. 2006); *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). "While an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons." *Id.* at 926. Any inconsistencies in an applicant's representations must "go to the heart of the applicant's claim." *Id.* "If discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." *Id.* (internal quotation marks and citation omitted).

Saah's brief offers no substantive response to the inconsistencies relied upon by the IJ in making his decision. We note, however, that the IJ likely placed undue weight upon certain problems with Saah's testimony. For instance, the Sixth Circuit has dismissed the significance of inconsistencies in dates provided by an applicant where they are unrelated to an applicant's claims of persecution. *See Yu v. Ashcroft*, 364 F.3d 700, 704 (6th Cir. 2004). Similarly, the court has suggested that initial airport interviews with immigration personnel constitute questionable impeachment materials because of the translation problems attending attempts to interview individuals upon their arrival in the United States. *See id.* at 703 n.4.

Those flaws in the IJ's analysis notwithstanding, we are bound to uphold a BIA credibility assessment unless the evidence compels a different result. *Cf. Syllva*, 388 F.3d at 925 ("A reviewing court should not reverse simply because it is convinced that it would have decided the case differently.") (internal quotation marks omitted). While the inconsistencies identified by the IJ might not, standing alone, warrant affirmance of the BIA decision, they collectively provide a

sufficient ground to question the veracity of Saah's claims of persecution and imminent harm. *See*

*Bah*, 462 F.3d at 642 (holding that even though IJ's adverse credibility determination was not based

on "overwhelming evidence," where petitioner failed to demonstrate that evidence required contrary

result, court would affirm BIA decision); *Yu*, 364 F.3d at 704 (noting that "cumulative effect" of

minor inconsistencies supported IJ's other grounds for denial of asylum). The IJ finding was not so

erroneous that it compels a contrary conclusion, and, for that reason, we will not disturb the decision

of the BIA to uphold the IJ's ruling.

## V.

For the foregoing reasons, we affirm the decision of the BIA denying Saah's application for

asylum and requests for withholding of removal.