NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0130n.06

No. 09-3461

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

**FILED**
**Mar 01, 2010**
LEONARD GREEN, Clerk

NINI SANAJ, VIOLETA SANAJ, VITO SANAJ, and
DORI SANAJ,

      Petitioners,

v.

ERIC HOLDER, JR.,
Attorney General,

      Respondent.

ON PETITION FOR REVIEW
OF AN ORDER OF THE
BOARD OF IMMIGRATION
APPEALS

_____/

BEFORE:     MARTIN, ROGERS, and McKEAGUE, Circuit Judges.

     BOYCE F. MARTIN, JR., Circuit Judge.

     Nini Sanaj, as lead petitioner, and his wife, Violeta, and two sons, Vito and Dori, as

derivative petitioners,[1] seek review of the order of the Board of Immigration Appeals upholding an

immigration judge's (IJ) denial of their application for asylum, withholding of removal, and

protection under the Convention Against Torture. They argue that the agency erred in finding Sanaj

not credible, that Sanaj did not receive a full and fair hearing because he was tired the day of his

_____

[1]Violeta Sanaj and her two sons initially filed their own asylum application, but later
withdrew the application and consolidated their request for asylum with Nini Sanaj's application
as derivative beneficiaries of his application. Accordingly, we refer primarily to Nini Sanaj in
this opinion as "Sanaj" unless otherwise indicated.

hearing and did not have his counsel of choice at the hearing, that Sanaj should be granted asylum for humanitarian reasons notwithstanding a finding of changed country conditions, and that the agency failed to consider his claim for protection under the Convention. Because the record does not compel a conclusion contrary to those of the IJ and the Board, we **DENY** review.

## I.

Sanaj is a fifty-four-year-old native Albanian. He contends that he and his family were persecuted in Albania beginning in 1990 due to his anti-communist beliefs and his work with the Democratic Party. Combining Sanaj's asylum application with his testimony before the IJ, Sanaj alleges the following chronology of events.

Sanaj was in the Albanian military, from either 1976 or 1987 (he testified to both dates during his hearing) until 1995. In his application, he alleges that police beat him with rubber batons in January of 1990 during an anti-communist rally in the town of Shkoder. Then, in June of 1990, again at an anti-communist rally in Shkoder, police kicked him and sprayed him with teargas. Sanaj's wife corroborated these claims in her testimony before the IJ, but Sanaj did not mention either of these incidents during his hearing before the IJ. Indeed, he asserted several times that the first incident of persecution by the police was not until December 1990.

Sanaj testified that he joined the Democratic Party and a group promoting democratic, multi-party elections in December of 1990. He claims that, on December 13, 1990, police in Shkoder stopped an anti-communist rally by beating the demonstrators, including Sanaj, late at night. He returned home, but police came to his house and arrested him in the early morning hours. (J.A. 263.) They took him to jail and, for two days, kept him in a small room with no restroom or drinking

water, and then for two more days in better conditions while they questioned him about the rally. An influential cousin allegedly brought about his release from prison.

In his application, Sanaj claims that he was arrested and mistreated by secret police on April 2, 1991, but he did not mention this incident in his testimony.

Sanaj next claimed that he was serving as an observer for the Democratic Party during elections in June or July of 1991, though his application indicated that the elections took place in October of 2000. (J.A. 713, 724-25.) In any event, he claimed that several armed men with guns entered the polling place and began stuffing the ballot box with fraudulent ballots. When Sanaj attempted to intercede, one of the men cut his hand with a knife, though, according to his application, he was stabbed and rendered unconscious. He was hospitalized for a period of days, though the number of days varies between two and five depending upon the source. Sanaj claims that he reported the incident to the police, but they did nothing.

The next incident allegedly occurred in 1998 while Sanaj was attending the funeral of a leader of the Democratic Party in the town of Tirana. He claims that police went into the funeral procession and began beating people, Sanaj included, with batons.

Next, in February of 2000, unknown men kidnapped Sanaj's son, Vito. Sanaj testified that the kidnappers never tried to contact him directly but told Vito that the kidnapping was "a gift for your dad" and that Vito should tell Sanaj that he should join the Socialist Party. Sanaj testified before the IJ that he never gave in to the kidnappers' demands. However, in his application, Sanaj claimed that the kidnappers wanted him to become a spy within the party, and that he agreed to the kidnappers' demands after they threatened and beat Vito. For his part, Vito testified that he had not

been harmed while in Albania and that he left Albania because his father was worried, although he did not know why his father would be worried.

The next incident occurred in January 2001, when several men raped Sanaj's wife as she walked home from a store. She testified that the men approached in a van and asked if she was Nini Sanaj's wife. When she responded in the affirmative, two men got out of the van and forced her inside. She testified that all three men raped her and then put her out of the van and said that they would do the same to her daughter if Sanaj did not leave the Democratic Party. She did not seek medical treatment and did not know who had raped her. However, she testified that she did tell her husband of the incident and that the two reported it to the police, but the police did nothing.

Sanaj testified that, in October 2001, several men approached him at a coffee shop in Shkoder and threatened him. They then cut him, requiring him to be hospitalized for five days. Sanaj did not include this incident in his asylum application.

The last incident allegedly occurred in December of 2002. He testified that several men attacked him with a knife in front of the Democratic Party headquarters in Shkoder and that he was cut on his hands. However, in his asylum application, Sanaj stated that the attack took place at a cafe, that the men yelled "that's him" and punched him until he fell to the ground, kicked him, and then stabbed him. No police report was filed.

On December 19, 2002, Sanaj traveled to Paris, France on his own passport. In Paris, he received a fake Italian passport for which he had paid $10,000. He then flew to Los Angeles, California on December 23, 2002. He filed an application for asylum, withholding of removal, and protection under the Convention on December 15, 2003, less than one year after his arrival.

The dispositive hearing before the IJ was scheduled for July 16, 2007, in Michigan. Approximately one month prior, Sanaj's attorney, Mr. Marshal E. Hyman,[2] had sought a postponement of the hearing because he had a hearing in a detained alien case in Texas that same day. The IJ did not rule on the motion prior to the hearing. On the day of the hearing, another attorney in Hyman's office, Mr. Russell Abrutyn, appeared on Sanaj's behalf. Sanaj apparently expressed surprise at the situation and initially objected to Abrutyn's representation, although Abrutyn had previously made an appearance in the case and Sanaj had met with Abrutyn at some point prior to the hearing. The IJ denied the previously filed motion to continue, but allowed Sanaj and Abrutyn approximately one hour to consult before beginning the hearing, after which Sanaj indicated that he wanted to go forward with the hearing that day with Abrutyn as his counsel.

The hearing proceeded, with Nini, Violeta, and Vito testifying. In addition to the testimony described above, Sanaj testified on direct examination that since entering the United States he had not been arrested or charged with a crime. However, on cross-examination, he admitted that he had been arrested for assault, and was apparently also charged with damage to property and a traffic violation, though he maintained that he was innocent of the charges. (J.A. 287-89.) At one point during the hearing, in an attempt to explain to the IJ a discrepancy in his testimony, Sanaj indicated that he had stayed up late the night before the hearing working and that he was tired. (*See* J.A. 237, 294-97.)

On July 30, 2007, the IJ issued an oral ruling denying Sanaj's request for asylum, withholding

---

[2]In the transcript of the hearing before the IJ, Sanaj's attorney's name is spelled "Highman" rather than "Hyman." However, it appears from the rest of the record that the proper spelling is "Hyman," so we use that spelling.

of removal, and protection under the Convention. The primary basis for the denial was the IJ's finding that Sanaj was not credible in his testimony about the events that happened in Albania. The judge therefore found that Sanaj had not met his burden on any of his asserted bases for relief. Alternatively, the IJ found that, even if Sanaj were credible, he had not established the necessary connection between the rape of his wife and the kidnapping of his son with his assertion of protected status due to political beliefs, as he could not show who committed the crimes or their motivation. The IJ also found that conditions in Albania had changed since the events Sanaj alleged and that this change in country conditions prevented Sanaj from demonstrating a well-founded fear of future persecution sufficient to merit asylum or withholding of removal. Finally, the IJ found that, even if Sanaj were credible, he had failed to meet his burden of proving a likelihood of torture sufficient to trigger protection under the Convention.

Sanaj appealed the IJ's decision to the Board. On March 25, 2009, in a brief order, the Board adopted the IJ's adverse credibility and changed country conditions findings and thus affirmed the IJ's decision. Sanaj timely petitioned this Court for review of the Board's decision.

## II.

As stated above, Sanaj makes four arguments in his petition for review: (1) that he was denied due process because he was fatigued the day of his hearing and did not have his counsel of choice present at the hearing; (2) that the IJ's adverse credibility finding was clearly erroneous; (3) that humanitarian concerns counsel in favor of asylum even if conditions in Albania have changed; and (4) that the agency failed to consider Sanaj's request for protection under the Convention. Where, as here, the Board merely adopts the IJ's decision without substantive discussion or addition,

we review the IJ's decision directly. *Denko v. INS*, 351 F.3d 717, 723 (6th Cir. 2003).

## A.     Due Process

Sanaj first argues that he was denied due process when he was forced to proceed with his hearing without his counsel of choice and when he was fatigued from having stayed up late the night before the hearing. Sanaj may prevail on his due process argument if he shows error and substantial prejudice to the outcome of the proceedings. *Garza-Moreno v. Gonzales*, 489 F.3d 239, 241 (6th Cir. 2007). We review a due process claim de novo. *Id.*

We begin with the argument that the IJ should have postponed the hearing so that Sanaj could be represented by his counsel of choice. As described above, Sanaj's primary attorney, Hyman, had submitted a motion to continue approximately one month prior to the hearing, seeking continuance because of another hearing that had been scheduled in Texas. The IJ did not rule on the motion prior to the hearing. Furthermore, based on our review of the transcript, it appears that Sanaj was confused about the issue because he expressed surprise and confusion about why Hyman was not present. He stated that he had received a letter from Hyman a few weeks prior to the hearing telling Sanaj that Hyman could not be present. As for the attorney present in Hyman's place, Abrutyn, Sanaj indicated that he was not aware that Abrutyn was even an attorney. Instead, although he had spoken with Abrutyn before and given him documents for use in his case, Sanaj told the IJ that he believed Abrutyn to be a clerk in Hyman's office. The IJ denied the motion to continue on the basis that the hearing had been scheduled for well over a year, that Sanaj had received plenty of time to prepare, and that Abrutyn, a licensed attorney familiar with the case and ready to proceed, was present on Sanaj's behalf. However, the IJ did provide Sanaj an hour to meet with Abrutyn before

proceeding with the hearing.

Whether the IJ should have postponed the hearing is, we suppose, subject to debate. Hyman filed the motion to continue one month in advance and the IJ credited Abrutyn's explanation of the circumstances surrounding the motion, that a hearing in a detained alien case in Texas had been rescheduled without Hyman's consent and that he had immediately filed the motion to continue in Sanaj's case. Furthermore, it is apparent from the transcript that Sanaj was highly agitated and upset with Hyman's absence on the day of the hearing. However, we need not decide whether the failure to continue the hearing was error as, even if it were, Sanaj was not substantially prejudiced by it. The transcript shows that, once the hearing moved past the preliminary matter of Hyman's absence and into substantive testimony and argument, Abrutyn did a commendable job of presenting Sanaj's case. Abrutyn was obviously familiar with the facts and the law, and we doubt that Hyman could have done anything differently or better. Indeed, in his brief before this Court, Sanaj does not point to any particularized problem with Abrutyn's performance. Accordingly, we find that Sanaj was not substantially prejudiced by the IJ's refusal to continue the hearing so that Hyman could be present.

As for Sanaj's claim that his expression of fatigue should have led the IJ to postpone the hearing, we are not persuaded. The transcript shows that he mentioned being tired a few times (J.A. 237, 251, 260, 294-97), but never in connection with a request for a continuance. Indeed, Sanaj expressly indicated that he was prepared to proceed. Accordingly, even if fatigue were sufficient grounds to continue a hearing, the IJ's failure to do so here was not error, as Sanaj never expressed that his fatigue was so severe that he could not proceed.

**B.      Adverse Credibility Ruling**

In an immigration case, it is the alien's initial burden to establish that he is eligible for asylum or, alternatively, that he qualifies for withholding of removal. In this case, the IJ found that Sanaj did not meet his burdens because of inconsistencies and omissions from his testimony that rendered him not credible. Sanaj claims that substantial evidence does not support the adverse credibility finding because the inconsistencies and omissions were minor and attributable to his fatigue.

Like any other finding of fact in an immigration proceeding, we will affirm an adverse credibility determination if it is supported by substantial evidence in the record. *Sarr v. Gonzales*, 485 F.3d 354, 360 (6th Cir. 2007). While this standard of review is highly deferential, such a determination "must be supported by specific reasons and must be based upon issues 'that go to the heart of the applicant's claim.'" *Id.* (quoting *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004)). Where, as here, the IJ bases an adverse credibility determination at least in part on discrepancies in the petitioner's testimony, "'[i]f discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility.'" *Id.* (quoting *Sylla*, 388 F.3d at 926). However, the fact remains that when we review a determination for substantial evidence, we may not reverse the IJ's determination merely because we would have decided the matter differently; we may only reverse if the record actually compels a determination different than that of the IJ. *Id.* at 359-60 (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)).

Our review of the transcript and the evidence in the record leads us to conclude that the IJ's adverse credibility determination was, indeed, supported by substantial evidence as defined by our precedents. Sanaj is correct that it would be unreasonable to expect perfect, mistake-free testimony given the passage of time and intervening events, and that an adverse credibility finding by an IJ may

not act as a shibboleth that clears the path to unquestioning affirmance by our Court. However, the discrepancies in Sanaj's testimony and between his testimony and his asylum application were real and, at times, glaring. Among other things, he repeatedly stated in testimony that the first instance of persecution occurred in December of 1990 but, in his asylum application, he attested to two incidents earlier in the year in which police allegedly beat him during anti-communist rallies.[3] Along similar lines, Sanaj testified that he was attacked outside of the Democratic Party office in December 2002, but in his application he stated the attack occurred outside of a cafe, a material discrepancy because an attack outside of a cafe could be for any number of reasons but one could infer that an attack outside of a party office was due to party affiliation. Finally, he claimed that he had never been arrested or charged with a crime since entering the United States, but he later admitted to having been arrested for assault. (J.A. 287-89.) Even if we would have been inclined to forgive these inconsistencies were we sitting in the role of the IJ, we cannot say that the IJ's adverse credibility determination finds no basis in the record. Thus, in light of the extremely deferential standard of review under which we operate here, we are compelled to affirm the IJ's adverse credibility determination.

---

[3]This example highlights an interesting aspect of Sanaj's case. As stated above, discrepancies typically bear on credibility only to the extent that they can be viewed as an attempt by the petitioner to strengthen or inflate his claims of persecution. Thus, in the typical case of discrepancies between an asylum application and later testimony, the testimony will assert more egregious facts than the application in an attempt to bolster the claim of past persecution. Here, however, there are numerous examples of the version of events in the application being harsher than the version in Sanaj's live testimony. Yet, there are also several instances of Sanaj's testifying to a materially worse state of affairs than that described in his asylum application, and these instances are "substantial evidence" sufficient to support the IJ's adverse credibility determination.

**C.      Asylum Based on Humanitarian Concerns**

As stated above, in addition to the adverse credibility determination, the IJ made an alternative finding that changed conditions in Albania negated any fear on Sanaj's part of future persecution.  In response, Sanaj points to authority standing for the proposition that, in some cases, a petitioner's past experiences may be so horrible that he should never be forced to return to his country of origin regardless of whether the country has changed.  He thus argues that his family's experiences, especially the kidnapping of his son and the rape of his wife, are of such extreme degree that no change in conditions can justify sending them back to Albania.  To be sure, the kidnapping of a child and rape of a spouse are horrifying events.  However, the IJ's changed country condition finding was in the alternative to the adverse credibility finding.  As the adverse credibility finding is sufficient to defeat Sanaj's asylum and withholding of removal claims, and as we have already affirmed that finding, we need not address Sanaj's assertion of humanitarian considerations.

**D.      Protection Under the Convention Against Torture**

Sanaj claims that the Board failed to consider his claim for protection under the Convention properly, instead impermissibly relying upon the IJ's adverse credibility finding to affirm the IJ's denial of protection under the Convention.  Regardless of whether it is true that it was error for the Board to rely on the IJ's adverse credibility determination for purposes of reviewing Sanaj's claim for protection under the Convention, in this case we are reviewing the IJ's decision, as adopted by the Board.  A review of the IJ's decision reveals that the IJ considered the Convention claim on its merits and found that Sanaj had not produced evidence that he would more likely than not be tortured upon return to Albania, which is the required showing under the Convention.  8 CFR §

208.16. This conclusion is supported by substantial evidence based on our own review of the record, so we affirm the denial of protection under the Convention.

### III.

For the reasons set forth above, we **DENY** the petition for review of the Board's decision.