NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0877n.06
Filed: December 27, 2007

No. 06-4086

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| AGOSTIN LUCA, ET AL., | ) | |
| | ) | ON PETITION FOR REVIEW |
| *Petitioners*, | ) | OF A DECISION OF THE |
| | ) | BOARD OF IMMIGRATION |
| v. | ) | APPEALS |
| | ) | |
| MICHAEL B. MUKASEY, ATTORNEY | ) | O P I N I O N |
| GENERAL OF THE UNITED STATES, | ) | |
| | ) | |
| *Respondent*. | ) | |

BEFORE: DAUGHTREY, COLE, Circuit Judges; and COLLIER, District Judge.[*]

**R. GUY COLE, JR., Circuit Judge.** Petitioners Agostin Luca, Valbona Luca, Xheni Luca,

and Alkida Luca (collectively "the Luca family"), a husband, wife, and two minor children who are

citizens of Albania, petition this Court for review of a final order of the Board of Immigration

Appeals ("BIA"), affirming an Immigration Judge's ("IJ's") decision to deny them asylum,

withholding of removal under the Immigration and Nationality Act ("INA"), and protection under

the United Nations Convention against Torture and other Cruel, Inhuman or Degrading Treatment

---

[*] The Honorable Curtis L. Collier, United States District Judge for the Eastern District of
Tennessee, sitting by designation.

or Punishment ("CAT").[1]  For the reasons set forth below, we deny their petition.

## I.

### A. Factual Background

Agostin, Valbona, Xheni, and Alkida Luca are all citizens of Albania who entered the United States at the San Francisco International Airport without proper documentation on August 28, 2001. Upon their arrival, an immigration inspector questioned Agostin regarding his and his family's entry into the United States.  Specifically, the inspector asked Agostin whether he was "on the run from anything in Albania." (JA 165.)  In response, Agostin answered affirmatively and further explained that "every one has guns there," which made him "afraid for [his] family's life." (*Id*.)  When asked whether he had any fear or concern about returning to Albania or being removed from the United States, Agostin once again responded affirmatively and opined that "Albania . . . is very dangerous." (JA 167.)  As a follow-up question, the immigration inspector asked Agostin if he would be harmed by returning to Albania.  Agostin replied that he did not "know what would happen in the future." (*Id*.)

After questioning Agostin, the immigration inspector engaged in a similar round of inquiry

---

[1]
The transcript of the removal hearing makes clear that the Luca family did not apply for protection under the CAT.  (JA 231.)  When the IJ questioned the Luca family's attorney about the specific claims they were advancing, he clarified that they were not seeking relief under the CAT, and the IJ accordingly acknowledged this fact.  (*Id*.)  Nevertheless, during the Government's closing argument, it encouraged the IJ to deny the Luca family's nonexistent CAT claim, and the IJ did just that when she issued her Opinion and Order.  (JA 66, 337.)  Given that the Petitioners never initially raised a CAT claim, did not challenge the IJ's denial of the CAT claim before the BIA, and did not expressly raise this issue in their petition for review to this Court (JA 1-6) the IJ's denial of the CAT claim is not before us on appellate review.

with Valbona Luca, Agostin's wife. When asked why she wanted to come to the United States, Valbona answered, "Because there is no security in Albania and there are no jobs as well." (JA 171.) The officer then asked Valbona why she left Albania, to which she responded, "Because in Albania everything is out of control." (JA 172.) Replying to the question of whether she would endure harm if forced to return to Albania, Valbona stated that she "[did not] know but maybe." (*Id*.)

The next day, on August 29, 2001, Agostin underwent a "credible fear interview,"[2] through which an asylum officer concluded that there was a significant possibility that the Luca family's claim regarding fear of return to Albania could be found credible at a full asylum or withholding of removal hearing. The Department of Homeland Security ("DHS") thereafter instituted removal proceedings against the Luca family pursuant to Section 240 of the INA. In filing Notices to Appear[3] against the Luca family on April 16, 2002, DHS charged petitioners with being ineligible for admission and thus subject to removal from the United States pursuant to INA § 212(a)(7)(A)(i)(I) because, at the time of entry, they were "not in possession of a valid unexpired immigrant visa,

---

[2]A "credible fear interview" is a screening procedure that usually occurs within forty-eight hours after an entering alien informs the immigration officer at the port of entry that he is fleeing persecution or seeking asylum. *See* 8 C.F.R §§ 208.30(d)-(g). As part of this process, the alien is transferred to a detention center where a specially trained asylum officer conducts an interview to determine whether the alien has a credible fear of persecution and/or torture in his home country. *Id*. The INA defines "credible fear of persecution" as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 208." *Id*.

[3] The INA explains that "[e]very removal proceeding conducted under section 240 of the Act . . . to determine the deportability or inadmissibility of an alien is commenced by the filing of a notice to appear with the immigration court." 8 C.F.R. § 1239.1.

reentry permit, border crossing card, or other valid entry document required by the Immigration and Nationality Act." (JA 83.) Agostin subsequently submitted a request to apply for asylum and withholding of removal pursuant to Section 208 of the INA. Thereafter, petitioners received both oral and written advisement in the Albanian language of the repercussions of knowingly filing a frivolous application for asylum. Agostin, in turn, filed his application for relief on behalf of himself and his dependent family members.[4]

The thrust of petitioners' asylum application is that they fear returning to Albania because they believe they will suffer persecution on account of Agostin's political opinion and membership in a social group. Specifically, Agostin claims that he experienced threats and persecution at the hands of the reigning Socialist government in Albania due to his affiliations with the Democratic Party. Agostin avers that he first became active in the Democratic Party in 1990 and that his involvement entailed participating in and organizing meetings, campaigning, and recruiting new members.

In his application for asylum, Agostin presents a chronology of six events detailing the alleged abuse and persecution he experienced at the hands of the Socialist Party arising from his Democratic political beliefs and membership in the Democratic Party. In December 1999, for example, Agostin alleges that he delivered a speech at a demonstration celebrating the ninth anniversary of the founding of the Democratic Party, during which time members of the Socialist

---

[4]The asylum regulations allow a lead family member to file a derivative asylum application on behalf of dependent family members who assert no independent grounds for asylum. *See* INA § 208(b)(3), 8 U.S.C. § 1158(b)(3). In such a situation, a grant of asylum for the lead family member automatically entitles the dependent family members to the same relief. *Id*.

Party captured him with force, thrust him into a minivan, and dragged him before the police. Agostin further claims that the police detained him for approximately eighteen hours and threatened to kill him. During this period of detention, Agostin states that masked police officers entered his cell in the dark, punched him, and broke his tooth.

A few months later, on April 11, 2000, Agostin states that he attended a meeting of all the branches of the northern Democratic Party in the city of Shkoder, Albania. After the meeting finished, Agostin avers that the police stopped him and some others in their vehicle as they returned to Lezhe. Along with the other occupants of the vehicle, he states that the Socialist police physically abused him because he attended the meeting with Sali Berisha, the leader of the Democratic Party. Specifically, he claims that the police hit him in the stomach, twisted his arm, and threw him to the ground for approximately twenty minutes.

In September 2000, Agostin submitted that four Socialist police officers raided his home in search of important documents and threatened to kill his children. When his wife initially resisted their entry, he insists that the police pushed her against the wall and threatened to kill her too. The police subsequently took Agostin by force to the police station, where he claims to have been "beaten very badly" and detained for approximately thirty-six hours. (JA 48, 74.)

Several months later, in February 2001, Agostin claims that he was attending a Democratic Party meeting in Lezhe and that, as he was leaving the meeting, the police beat him. After dragging Agostin into their minivan, he asserts that they "tied up his feet and hands, and began hitting him on the shoulders and on his face and eye." (Appellants' Br. 10.) He further claims that the police placed a gun at his throat and "swore to kill [him]." (JA 79.) Although Agostin asserts that the

police did not remove him from the site of the beating, they detained him in the minivan for "approximately thirty minutes to one hour." (Appellants' Br. 10.)

Two months later, in April 2001, Agostin alleges that, after a social gathering with friends, the police detained him and struck him in the legs and ribs for approximately thirty to forty minutes. Agostin claims that the police threatened that if he did not relinquish his ties to the Democratic Party, they would kill him. The police then arrested him and beat him to the point of unconsciousness. Because his injuries were so severe, Agostin states that he was sent to the hospital for treatment and received intravenous relief.

Lastly, Agostin cites to August 10, 2001 as the final day of abuse. On this day, as he was departing a Democratic Party meeting in Lezhe, he insists that the police "grabbed him and took him to jail, where they held him for three days." (Appellants' Br. 11.) He further claims that the police starved and beat him to the point of unconsciousness. Given the severity of this final encounter with the police, Agostin explained that he was convinced of the need to flee Albania and accordingly departed the country with his wife and two daughters seventeen days later.

**B. Procedural History**

After the filing of both petitioners' asylum application and the Department of State Office of Asylum Affairs' response, the Honorable Elizabeth A. Hacker of the United States Immigration Court in Detroit, Michigan held a removal hearing on August 21, 2002, in which the Luca family appeared in person represented by counsel. In lieu of removal, petitioners sought asylum, withholding of removal under the INA, and their hearing was subsequently held on February 17,

2005.

Considering petitioners' admissions in conjunction with the evidence in the record, the IJ sustained the charges of removal because the Luca family failed to demonstrate both "that they are clearly and beyond a doubt entitled to be admitted and not otherwise inadmissible" and "that they are lawfully present in the United States pursuant to prior admissions." (JA 40-41.) Overall, the IJ held that "the inconsistencies and discrepancies [in the record evidence and testimony]. . . are more than incidental misstatements" and "go to material facts that [are] quite clearly [at] the heart of the claim." (JA 65.) Consequently, the IJ found that the "quantum of the inconsistencies and the suspect nature of the documents . . . are so great that the Court must find that the [petitioners have] in fact submitted a frivolous application for asylum." (JA 66.) Given its finding that the Luca family failed to satisfy its burden of proof for asylum, the IJ necessarily found that petitioners failed to meet the more stringent burden of proof underlying their claim for withholding of removal.

On appeal to the BIA, in a summary opinion on July 14, 2006, a single member of the Board adopted and affirmed both the IJ's decision to deny petitioners' asylum application and the IJ's finding that they had knowingly filed a frivolous application. The BIA only departed from the IJ's decision to the extent that part of the adverse credibility findings stemmed from the IJ's own analysis of the signatures and type on some of the documents. The Luca family timely appealed to this Court.

## II. STANDARD OF REVIEW

Where the BIA adopts the IJ's reasoning in a summary disposition, we review the IJ's decision directly to determine if the BIA's affirmance should be upheld. *Denko v. INS*, 351 F.3d

717, 723 (6th Cir. 2003). Pursuant to such review, we assess the IJ's determination, including adverse credibility findings, under a substantial-evidence standard and will not disturb the IJ's findings provided they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)); *Namo v. Gonzales*, 401 F.3d 453, 456 (6th Cir. 2005). We have clarified that an IJ's factual findings are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 252(b)(4)(B)); *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003) (stating that an asylum applicant must show "that the evidence presented was so compelling that no reasonable factfinder could fail to find the requisite persecution or fear of persecution"); *Singh v. Ashcroft*, 398 F.3d 396, 402-04 (6th Cir. 2005) (upholding an IJ's adverse credibility finding in a "very close case," where substantial evidence supported an IJ's reliance on "two key inconsistencies in [the alien's] asylum application and his oral testimony," even though "several of the [other] grounds upon which the IJ relied [were] somewhat questionable").

## III. DISCUSSION

### A. Due Process

On appeal, the Luca family argues that, by failing to provide a meaningful review of the IJ's order denying them asylum and withholding of removal, the BIA violated their due-process rights to a fair proceeding under the Fifth Amendment. In support of their due-process argument, petitioners advance two claims. First, they insist that they provided convincing explanations for the

evidentiary discrepancies and weaknesses in credibility noted by the IJ, but that the BIA failed to consider this information.  To substantiate this claim, petitioners point to their attempts to reconcile the evidence underlying Agostin's credible fear interview, the inconsistencies in dates and omissions in Agostin's chronology of persecution, and the affidavit of the dentist, Dr. Agron Meta.

The second prong of petitioners' due process argument is that the IJ denied them a fair proceeding by allegedly engaging in inappropriate forensic examination of their documents and displaying her bias toward petitioners.  Specifically, petitioners insist that it was inappropriate for the IJ herself to examine the signatures contained in the affidavits of Zef Gjokaj and the Police Commissariat of Lezhe and to determine, on the basis of her own inspection, that the signatures on the documents did not match.  Petitioners claim that the IJ's forensic findings "prejudiced [them] . . . [because] she drew impermissible conclusions about the documents based on alleged differences in signatures of which she is not qualified to judge." (Appellants' Br. 29.)

In further support of their argument, petitioners cite to the BIA summary affirmance. According to petitioners' interpretation, the BIA's opinion disagrees with the IJ's "forensics examination because the [BIA] recognized that this analysis is beyond the permissible scope of analysis of an Immigration Judge."  (*Id*.) Specifically, the BIA opinion adopts and affirms the IJ's decision "except to the extent that it was based on her own analysis of the signatures and the type on some of the documents." (JA 8.)

In an asylum or deportation hearing, an alien is entitled to the Fifth Amendment guarantee of due process of law.  *See Accardi v. Shaughnessy*, 347 U.S. 260 (1954).  This Court has squarely held in several published opinions, however, that the BIA's "streamlining" procedure, whereby a

single BIA member affirms an IJ's decision without stating the basis for the affirmance if the criteria in 8 C.F.R. § 1003.1(e)(4) are met, comports with due process. *See Rreshpja v. Gonzales*, 420 F.3d 551, 557-58 (6th Cir. 2005); *Denko v. INS*, 351 F.3d 717 (6th Cir. 2003). The BIA may adopt the decision of an IJ by way of a single member order if the issues on appeal are "squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation," or, if the "factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion." 8 C.F.R. § 1003(1)(e)(4)(I).

    1. <u>Petitioners' First Due Process Claim: The BIA's Failure to Consider Reconciling Evidence</u>

With respect to the first set of petitioners' due-process claims–that the BIA failed to account for the evidence they presented in an attempt to reconcile the evidentiary inconsistencies in their case for asylum, we find petitioners' argument to be meritless. Pursuant to its streamlining procedures, the BIA possesses full authority to affirm summarily an IJ's decision without specifically chronicling the reasons for its affirmance when the "factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion." 8 C.F.R. § 1003(1)(e)(4)(I). In this case, the BIA did not exceed the bounds of its authority when it decided that the Luca family's case presented routine issues of asylum law that necessitated little more than a summary affirmance. Accordingly, the BIA did not violate petitioners' due process rights through its summary order.

    2. <u>Petitioners' Second Due Process Claim: Improper Forensic Evaluation and IJ Bias</u>

With respect to petitioners' second set of due process claims–that the IJ engaged in an inappropriate forensic assessment of the documentary evidence and exhibited prejudice toward petitioners, we are without jurisdiction to review these claims. In its July 14, 2006 order, the BIA specifically stated that it was adopting and affirming the IJ's decision in full "except to the extent that it was based on her own analysis of the signatures and type on some of the documents." (JA 8.)

As elucidated above, when the BIA relies on the IJ's decision to support its summary affirmance, this Court looks directly to the IJ's decision to determine whether to uphold the BIA on appeal. *Denko*, 351 F.3d at 723. Because the BIA specifically declined to adopt the IJ's decision regarding her analysis of the signatures and type, however, this issue is not properly before us on appeal. Therefore, we lack jurisdiction to analyze the portions of the IJ's decision harnessing such forensic examination techniques and accordingly do not reach the merits of this issue.

Likewise, we lack jurisdiction to review petitioners' argument regarding the IJ's improper bias toward them. Petitioners raise this issue for the first time on appeal and did not raise the issue before the BIA. Pursuant to section 242(d)(1) of the INA, 8 U.S.C. § 1252(d)(1), aliens must exhaust claims on appeal to the BIA before presenting them to this Court. *Ramani v. Ashcroft*, 378 F.3d 554, 558 (6th Cir. 2004) (explaining that "to the extent that Ramani has failed to exhaust his administrative remedies with respect to certain claims, this court does not have jurisdiction to address those claims"); *Perkovic v. INS*, 33 F.3d 615, 619 (6th Cir. 1994). Since the petitioners did not contest the IJ's impartiality before the BIA, we are unable to consider the merits of their bias-based due-process claim.

**B. The Luca Family's Asylum Application**

1. The IJ's Denial of the Luca Family's Asylum Application

In addition to their due process claims, petitioners allege that the IJ's decision was manifestly contrary to law and constituted an abuse of discretion .

Asylum applications are reviewed under a two-part test. First, the IJ must determine whether the petitioner qualifies as a "refugee" within the meaning of the INA. 8 U.S.C. § 1158(b)(1)(A); *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994). Second, the IJ asks whether the petitioner merits a favorable exercise of discretion by the Attorney General. *Id*. The petitioner bears the burden of proof at both stages. *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004) (citing *Klatwitter v. INS*, 970 F.2d 149, 151 (6th Cir. 1992)).

The INA defines a "refugee" as any person who is unable or unwilling to return to his home country or last habitual residence "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). To establish his status as a refugee, a petitioner must demonstrate either that he has "suffered actual past persecution or that he has a well-founded fear of future persecution." *Pilica*, 388 F.3d at 950 (citations omitted); *see also Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005) (per curiam).

Central to findings of both past persecution and future persecution are issues of credibility. Credibility determinations are considered findings of fact and thus are reviewed under the substantial-evidence standard. *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). While we thus examine adverse credibility findings deferentially, there must nevertheless exist specific reasons to

buttress such findings. *Sylla*, 388 F.3d at 925. "An adverse credibility finding must be based on issues that go to the heart of the applicant's claim. They cannot be based on an irrelevant inconsistency." *Id*. (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n. 2 (6th Cir. 2004)(internal quotations omitted)).

Applying this standard, we find no error in the IJ's interpretation of the evidence. Contrary to petitioners' assertion, the IJ's determination that there was a "complete lack of credibility in [petitioners'] case" was based on specific reasons that go to the heart of their claim for asylum. (JA 65.) Most significantly, both the IJ and BIA focused on the fact that, during both his sworn statement at the airport and his credible fear interview, Agostin omitted any references to the beatings and arrests he allegedly endured at the hands of the Albanian police. Moreover, both the IJ and BIA rejected Agostin's attempt to explain away the significance of this omission due to the psychological pressure he was under from travel, because Agostin testified at his asylum hearing that the principal reason he fled Albania was to escape the persecution he and his family suffered. Given Agostin's testimony that persecution was a key factor in his reason to leave Albania, the IJ and BIA found his failure to mention to immigration officials at the airport the abuse he suffered indicative of a lack of credibility. Since Agostin's alleged reasons for leaving are central to his claim that he was persecuted in Albania on account of his affiliations with the Democratic Party, it was proper for the IJ to base her adverse credibility finding on this inconsistency.

Likewise, it was proper for the IJ to deny petitioners' asylum application based on the discrepancy between Agostin's testimony and his application regarding the first date of persecution. Despite Agostin's contention that this discrepancy arose from translation and transcription errors,

the IJ and BIA found that, in both his testimony and application, Agostin stated that the rally where he was first abused took place to commemorate the ninth anniversary of the founding of the Democratic Party.  Exercising its legitimate authority to take administrative notice that the Democratic Party came into existence in December 1990, it was more than reasonable for the BIA to doubt Agostin's testimony that the ninth-anniversary celebration was held in April, rather than December, 1999. *See* 8 C.F.R. § 1003.1(d)(3)(iv) (authorizing the BIA to take "administrative notice of commonly known facts such as current events or the contents of official documents").

Substantial evidence further underlies the IJ's findings regarding the suspect credibility of petitioners' birth certificates.  The birth certificate for the youngest petitioner bears an issuance date of "5.10.2001."  The IJ and BIA interpreted this date according to the American standard and accordingly found the issuance date to be May 10, 2001.  Given that the youngest daughter's birth date and birth certificate issuance date were both May 10, 2001, the IJ and BIA found it suspicious that the picture affixed to the birth certificate portrayed an infant at least several months in age, rather than a one-day-old newborn.  On appeal, petitioners, however, argue that the issuance date on the birth certificate should be read according to the European standard as October 5, 2001, which would explain the affixed photograph of a baby several months old.  Given, however, that the birth certificates of the other petitioners all employ the American standard in designating the issuance date, substantial evidence supports the IJ's reasoning that the American standard should also be applicable to the youngest daughter's birth certificate.

Lastly, we find as conclusive the IJ's decision to discredit the affidavit of the Police Commissariat in Lezhe.  In his affidavit, the Police Commissariat declared that the police "were

forced to threaten and mistreat Mr. Agostin Nik Luca in several occasions and arrest him twice due to his political participation in protests and different meetings organized by the Democratic Party." (JA 133.) The IJ believed that a document in which a public police official would admit outright to threatening and mistreating a civilian was simply incredible on its face. In contrast, petitioners insist that, rather than discounting the document based on its inherent implausibility, the IJ should have submitted it to the United States Embassy in Albania for further verification. Petitioners, however, cite no authority which would mandate that the IJ discard her own credibility determinations in favor of such external verification measures.

On the contrary, as arbiters of credibility, immigration judges are entitled to base adverse credibility determinations on any evidence they deem to be inherently implausible as long as there is evidence in the record to substantiate such a finding. *See, e.g.*, *Sylla*, 388 F.3d at 927; *Vasha*, 410 F.3d at 870; *Hasan v. Ashcroft*, 397 F.3d 417, 418 (6th Cir. 2005). Moreover, coupled with the IJ's citation to the 2001 Profile of Asylum Claims and Country Conditions for Albania, which indicated that reliance on fraudulent documents is a common practice among Albanian asylum applications, the IJ's finding of inherent implausibility of the Police Commissariat's affidavit is supported by substantial evidence.

Taken together, a review of the record, including the testimonial evidence of Agostin and Valbona, petitioners' asylum application, and their supporting documentation, leads us to conclude that the IJ's denial of asylum is buttressed by reasonable, substantial, and probative evidence.

2. The IJ's Frivolousness Finding

Beyond contesting the IJ's denial of their asylum application, the Luca Family also disputes

the IJ's finding that they filed a frivolous asylum application. Any alien adjudged to "ha[ve] knowingly made a frivolous application for asylum" is forever ineligible for any sort of immigration to the United States. 8 C.F.R. § 1158(d)(6). "[A]n asylum application is frivolous if any of its material elements is deliberately fabricated." . 8 C.F.R. § 1208.20 (2006). We conduct substantial-evidence review of frivolousness determinations. 8 U.S.C. § 1252(b)(4)(B).

Recently, in *Matter of Y-L*, 24 I&N Dec. 151 (BIA 2007), the BIA announced specific procedures an immigration judge must follow in determining that an asylum application is frivolous. Specifically, an immigration judge must (1) give proper notice to the petitioner of the consequences of filing a frivolous application for asylum; (2) make specific findings that the petitioner deliberately fabricated a material element of the asylum claim, separate from an adverse credibility determination; (3) give the petitioner an opportunity to explain any discrepancies in the record; and (4) provide cogent and convincing reasons for determining that the evidence supports a frivolousness finding, taking into account any explanations by the petitioner for the discrepancies in the record. *Y-L*, 24 I&N at 155.

Although the Luca Family contends that the IJ in their case departed from these procedures in characterizing their application as frivolous, our review indicates otherwise. First, the petitioners received both oral and written advisement in the Albanian language of the repercussions of knowingly filing a frivolous application for asylum. (JA 39.) Second, the IJ explained that, in this case,

> [t]he quantum of inconsistencies and the suspect nature of the documents in this case are so great that the Court must find that the respondent has in fact submitted a frivolous application for asylum after oral and written advisals on the same. The Government has asked for a frivolous finding and the Court will so grant. (JA 66.)

- 16 -

Thus, to support its frivolousness finding, apart from the adverse credibility determination, the IJ specifically cited to the sheer number of factual discrepancies in the record and the suspicious character of the affidavits. Moreover, the IJ's written opinion indicates that she allowed the petitioners the opportunity to explain any discrepancies in the record and took these explanations into account in arriving at her frivolousness finding. Therefore, we find there is substantial evidence underlying the IJ's finding that the Luca family filed a frivolous application for asylum.

**C. The Luca Family's Application for Withholding of Removal**

In addition to denying them asylum, the IJ also denied the Luca family's claim for withholding of removal pursuant to 8 U.S.C. § 1231(b)(3)(A). On appeal to both the BIA and this Court, however, petitioners do not challenge this portion of the IJ's decision. We therefore lack jurisdiction to consider whether the IJ erred as to these issues, since the Luca family did not exhaust their administrative remedies by presenting them to the BIA. *See* 8 U.S.C. § 1252(d)(1); *Liti v. Gonzales*, 192 F.3d 631, 641 (6th Cir. 2005).

**D. The BIA's Failure to Assign the Case for Review by a Three-Member Panel**

As their last ground for relief, petitioners advance a cursory argument that the BIA erred by refusing to designate their case for review by a three-member panel and instead proceeding with a single-member summary affirmance. Specifically, petitioners allege that the IJ made erroneous factual determinations when she found that Agostin lacked credibility, and so a decision by a three-member panel of the BIA is necessary to review such clearly erroneous fact-

finding.

Under BIA regulations, a case may be assigned for review by a three-member panel if it falls into one of six circumstances:

(i) The need to settle inconsistencies among the rulings of different immigration judges;

(ii) The need to establish a precedent construing the meaning of laws, regulations, or procedures;

(iii) The need to review a decision by an immigration judge or the Service that is not in conformity with the law or with applicable precedents;

(iv) The need to resolve a case or controversy of major national import;

(v) The need to review a clearly erroneous factual determination by an immigration judge; or

(vi) The need to reverse the decision of an immigration judge or the Service, other than a reversal under § 1003.1(e)(5).

8 C.F.R. § 1003.1(e)(6).

In the instant case, petitioners seem to argue that their case should have been channeled into three-member review based on the fifth ground, namely that the IJ rendered factual determinations which were clearly erroneous. Considering the case law of this Circuit, however, we decline to review the BIA's determination not to refer petitioners' case to a three-member panel. Petitioners have failed to sustain their burden to identify the specific factual findings that are erroneous and that militate against the IJ's adverse credibility findings. Rather than pointing to specific factual determinations that were in error, petitioners' brief instead generally and vaguely states that the IJ "made erroneous factual determinations in determining that Petitioners were not credible and that they had filed a frivolous asylum application." (Appellants' Br. 39.) The burden, however, is on petitioners to prove their claims to us. *See U.S. v. Lopez-Medina*, 461 F.3d 724, 748 n.6 (6th Cir. 2006) (stating that "[i]t is well established that issues adverted to merely in a perfunctory manner in an Appellants' main brief are deemed waived") (citing

*McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)).  Since petitioners have failed to proffer any evidence in support of their contention that the BIA erred in refusing to assign this case to a three-member panel, we need not address the issue.

## IV. CONCLUSION

For the preceding reasons, we DENY the petition for review.